ALAN'S OF ATLANTA, INC.,
Plaintiff–Appellant,

v.

MINOLTA CORPORATION, Robert La-
throp, Wolf Camera, Inc., and
Charles Wolf, Defendants–Appellees.

No. 89–8073.

United States Court of Appeals,
Eleventh Circuit.

June 22, 1990.

Michael W. Higgins, Higgins & Dubner, Atlanta, Ga., Stephen W. Armstrong, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., John D. Jones, Greene, Buckley, Derieux & Jones, Atlanta, Ga., for plaintiff-appellant.

Neely & Player, Atlanta, Ga., for Minolta and Lathrop.

Jeffrey L. Kessler, Ronald LaRussa, David D. Leitch, Weil, Gotshal & Manges, New York, NY, for defendants-appellees.

David R. Aufdenspring, Powell Goldstein Frazer & Murphy, Atlanta, Ga., for Wolf.

Before FAY and COX, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge:

This case concerns the propriety of summary judgment in an antitrust action

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

brought by a private plaintiff. The action alleges, among other things, violations of sections 2(a), 2(d), 2(e), and 2(f) of the Clayton Act, as amended by the Robinson–Patman Act, 15 U.S.C. §§ 13(a), (d), (e), and (f). The court below concluded that summary judgment was appropriate. After reviewing the record we conclude otherwise, and therefore reverse.

### I.

Alan's of Atlanta, Inc. ("AA") was an Atlanta-based "specialty" retailer of cameras and related equipment. It had stores in Atlanta and throughout Georgia and Florida. At the start of 1979 AA had a substantial share of the Atlanta market for Minolta-brand camera sales, about 33%, and an overwhelming share of specialty store sales, about 78%. By the end of 1985 AA's fortunes had taken a turn for the worse. Its Atlanta market share of Minolta camera sales had plummeted to about 4%. Its share of specialty store sales suffered a similar fate. During this same period AA witnessed the dramatic rise of a competing specialty camera retailer, Wolf Camera, Inc. Wolf Camera had captured the 29% of the Minolta camera market lost by AA and then some. Its share of that market rose from about 6% to about 41%. Even more dramatic was the rise in its share of specialty camera store sales, which rocketed from about 14% to over 65%. AA's president, Alan Goodelman, could only guess at the cause of Wolf Camera's rise and AA's fall. He surmised that AA's problems were caused by a faulty computer system, or perhaps by a bad management decision to expand in Florida.

In June of 1985 Goodelman was approached by Eugene Grabowski, a former Southeast Region sales manager for Minolta Corporation ("Minolta").[1] Grabowski brought news that a price discrimination scheme may have led to AA's woes. He told Goodelman that Minolta had market development fund ("MDF") accounts through which benefits were disbursed by either the national director of sales or the regional sales managers. These benefits had been used prior to 1979 for the equal good of all Minolta retailers. In 1979 Robert Lathrop took over as national director of sales, however, and instituted a "key dealer" program in which the MDF benefits were to be channeled disproportionately to "key dealers" in various cities. The MDF accounts were to support a program in which these selected dealers would be given free cameras and camera equipment, free advertising, free promotions, and various other benefits not available to non-key dealers.

Grabowski alleged that the key dealer program was motivated by two rationales. First, Minolta promotions could be cheaper if limited to one retailer with a large-volume capacity. For example, instead of making 100 shipments of 100 cameras to 100 retailers during a promotion, Minolta could make 1 shipment of 10,000 cameras to one retailer, saving distribution costs. Although the program was not designed to put non-key dealers out of business, it was designed to concentrate the market and to create a market leader through whom the promotions could be handled efficiently. Second, the program was designed to create a *de facto* vertical integration of Minolta with selected retailers, at least in some respects. According to Grabowski, Lathrop believed that after helping a retailer achieve success, he could dictate to the retailer what cameras to sell and at what price.

Key dealers were usually the highest volume dealers within a defined market area. AA was the highest volume dealer in the Atlanta market at the time the key dealer program was instituted, but it was not chosen by Minolta as the Atlanta area key-dealer. Grabowski alleged that Lathrop personally disliked Goodelman, and, in any case, felt that Wolf Camera had more sales potential. Thus Wolf Camera

---

**1.** Minolta was the authorized United States distributor for and a wholly owned subsidiary of Minolta Camera Company Limited ("Minolta Japan"), a Japanese manufacturer of cameras and related equipment.

was chosen in AA's stead.[2]

As beneficiary of the key dealer program, Wolf Camera was slated to receive over non-key dealers a price advantage on purchases. Grabowski alleged that Lathrop and Charles Wolf, the owner and CEO of Wolf Camera, hashed out the range of advantage. The range settled upon was four to seven percent per purchase dollar, generally, with specific instances of up to ten percent.[3] Grabowski told Goodelman of various incidents in which he furtively conferred some of this advantage to Wolf Camera by giving it free goods, advertising, and other benefits.

According to Grabowski, the key dealer participants realized that a program imbued with such favoritism bordered on illegality. To avoid legal trouble, Minolta and Lathrop purportedly instructed the regional managers to be familiar with three contrived explanations for their actions: (1) that the favoritism was necessary to meet competitive pricing actions within the marketplace; (2) that the favoritism was necessary to meet competitive advertising actions within the marketplace; and (3) that the favoritism was necessary to compete against grey market pricing. The latter excuse could prove particularly persuasive. In the United States there clearly were grey market[4] camera equipment sellers,

the identity, prices, and practices of which were rather obfuscated.

After hearing this tale Goodelman's thinking changed about why AA had taken a bath in the marketplace. He no longer blamed the faulty computer or a bad management decision, but rather Minolta's alleged "key dealer" scheme. Goodelman immediately obtained the services of counsel. Sometime later AA cut off its relationship with Minolta and on February 18, 1986, it filed a five-count complaint in federal court against Minolta, Lathrop, Wolf Camera, and Wolf ("the Appellees").

■ The complaint, as amended, alleged in Count I that Minolta and Lathrop had violated section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act [hereinafter referred to simply as the RPA] by engaging in a scheme of price discrimination. Section 2(a)[5] makes it (potentially) illegal for a seller to discriminate in price between its customers where the discrimination leads to a reasonable possibility that competition in general or competition with the favored customer specifically may be adversely affected, *Corn Prod. Ref. Co. v. FTC*, 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L.Ed. 1320 (1945), unless the discrimination is justifiable on the basis of the seller's

---

**2.** Although Wolf Camera was allegedly selected as the Atlanta market key dealer, it was not the only key dealer selling Minolta cameras in Atlanta. Some national market key dealers, *e.g.,* Service Merchandise, had a substantial presence in Atlanta.

**3.** As Wolf Camera purchased Minolta goods in the amount of $12,891,883 over a period of time comparable to that in which the price discrimination was alleged to have taken place, the purported favoritism translates into the following amounts: (1) At 4%, $537,161 (.96X = $12,-891,883; X = $13,429,044; $13,429,044 − $12,-891,883 = $537,161); (2) At 5%, $678,520; (3) At 6%, $822,886; (4) At 7%, $970,356.

**4.** The "grey market" refers to goods that were sold abroad by camera manufacturers at a price low enough to make it profitable for the foreign purchasers of those goods to export them into the United States. Once exported to the United States, the goods compete with those sold through normal, authorized, distribution channels. It is somewhat ironic that in this price

discrimination case the alleged competitive threat is the grey market, which is often created by price discrimination on an international scale.

**5.** Section 2(a) provides, in relevant part, as follows:

It shall be unlawful for any person ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered....

15 U.S.C. § 13(a).

**1418**

costs. *FTC v. Morton Salt Co.,* 334 U.S. 37, 43–44, 68 S.Ct. 822, 827, 92 L.Ed. 1196 (1948). The section does not ban price discrimination *per se,* but only non cost-justified price discrimination that causes the requisite injury to competition or competitors.[6]

Count V alleged that Minolta and Lathrop, through the same scheme, had violated RPA sections 2(d) and 2(e). Sections

**6.** A controversy has raged (and continues to rage) over the meaning of the word "competition" as used in the so-called "competitive injury" phrase of section 2(a). *See, e.g., Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1143 (Starr, J.); *id.,* at 1148–52 (Williams, J., concurring); *id.,* at 1152–63 (Mikva, J., dissenting). The word "competition" as generally used in the antitrust laws seems capable of meaning different things to different people and, according to one commentator, can be interpreted in at least five ways. *See R. Bork, The Antitrust Paradox* 58–61 (1978). To some, "competition" can only mean "any state of affairs in which consumer welfare cannot be increased by moving to an alternative state of affairs through judicial decree," *id.,* at 61, and competitive injury under the antitrust laws cannot occur unless an action taken has the net effect of restricting output and raising prices, *i.e.,* lowering consumer welfare. *Id.,* at 122. *See also Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1334 (7th Cir.1986). Under this interpretation a proven injury to competitors is irrelevant under the antitrust laws (including the RPA); the focus of inquiry is on the detrimental effects of prices on *consumers,* not the detrimental effect of prices on *competitors,* for rarely the twain shall meet.

Judicial precedent, however, suggests that in the RPA the meaning of competition is not so narrow, nor the gap between an injury to competition and an injury to competitors so wide. Indeed, many cases dealing with secondary-line price discrimination (as does this one) hold or suggest that an injury to competition is proved by showing an injury to competitors. *See, e.g., Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434–38, 103 S.Ct. 1282, 1288–90, 75 L.Ed.2d 174 (1983) (section 2(a) competitive injury shown where price charged to "competing purchasers" was different; effect on consumers not considered); *Morton Salt,* 334 U.S. 37, 45–47, 49–50, 68 S.Ct. 822, 828, 830 (section 2(a) "was intended to justify a finding of injury to competition by a showing of 'injury to the competitor victimized by the discrimination' "; proof that "the competitive opportunity of … merchants [was] injured" shown by fact that disfavored purchasers "had to pay [the seller] substantially more for their goods than their competitors had to pay"); *Corn Prod. Ref. Co.,* 324 U.S. 726, 738–39, 65 S.Ct. 961, 967 (price differentials that divert business from one competitor to another create an effect that "may be to substantially lessen competition."); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1040 (9th ed. is.Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989) (injury of harm to competitors probative of injury to competition); *Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 385 (8th Cir.1987) (harm to competition established by showing harm to competitors); *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 580 (5th Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982) (to establish competitive injury under section 2(a) a plaintiff "must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor"); *Foremost Dairies, Inc. v. FTC,* 348 F.2d 674, 678 (5th Cir.), *cert. denied,* 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965) (recognizing that section 2(a) protects injury to competition as well as injury to competitors). *But see Boise Cascade, supra,* at 1143 (harm to competition all that matters); *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 420 (8th Cir.1986) (RPA refers to competition in general, not competitors). This interpretation has carried over to primary-line price discrimination as well. *See Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (local market price war driving down prices injured competitor, thus it injured competition); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396 (7th Cir.1989) (recognizing difference between law and economics); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989) (predatory intent to destroy competitor). *But cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (allegations conflicting with economic theory are to be viewed skeptically). The gist of these cases, representing about a half-century of RPA interpretation, is that the legal focus of the competitive injury inquiry is on the competitor, not the consumer. For section 2(a) purposes, whether or not output is restricted or prices are raised simply is not dispositive.

We need not address this issue in any greater detail at this time. We address it at all only because the controversy over competitive injury may have implications for our later analysis of "antitrust injury" under Clayton Act section 4, 15 U.S.C. § 16. For the time being we are satisfied merely to make it clear that when confronted with contemporary economic argument on the one hand and judicial precedent on the other, we feel, unlike those of a more activist bent, *see, e.g., R. Bork, supra,* at 36, that economic argument is not ultimately controlling; judicial precedent is.

2(d) and (e) are not as generous to discriminating sellers as is section 2(a). Section 2(d)[7] prohibits a seller from paying a customer for "services or facilities" furnished by the customer in connection with the resale of the seller's product, unless the opportunity to receive such a payment is available to all of the seller's customers on "proportionally equal terms." *See FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 350–53, 88 S.Ct. 904, 909–10, 19 L.Ed.2d 1222 (1967); *FTC v. Simplicity Pattern Co., Inc.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959). The section has no "competitive injury" or "cost justification" escape clause like section 2(a). *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 79, 99 S.Ct. 925, 932, 59 L.Ed.2d 153 (1979); *Simplicity Pattern, supra*, 360 U.S. at 66, 70, 79 S.Ct. at 1012, 1014. To force all price discrimination to take a readily recognizable form— from whence it can be tested under the "competitive injury" and "cost justification" guidelines of section 2(a)—section 2(d) creates liability for certain indirect price discriminations related to resale programs upon the mere showing that the indirection *is* price discrimination, thus "nipping potentially destructive practices before they reach full bloom." *Simplicity Pattern, supra*, at 68, 79 S.Ct. at 1013. Section 2(e)[8] is similar in scope and language to section 2(d), *see e.g., Great Atl. & Pac. Tea Co., supra*, 440 U.S. at 79, 99 S.Ct. at 932, except it bans a seller from furnishing to a customer a service or facility connected with the resale of the seller's product (rather than paying a customer for so furnishing), unless the opportunity to receive the seller's service or facility is available to all of the seller's customers on "proportionally equal terms." *Simplicity Pattern, supra*, 360 U.S. at 65, 79 S.Ct. at 1011.

Count II alleged the corollary of Counts I & V, that Wolf and Wolf Camera knowingly received discriminatory price advantages in violation of section 2(f)[9] of the RPA. The remaining counts alleged violations of state law: that the Appellees intentionally and tortiously interfered with AA's business and contractual relations (Count III) and that Minolta had breached an implied covenant of good faith and fair dealing made with AA (Count IV).

■ Appellees answered the complaint by asserting, among other things, a defense contained in RPA section 2(b).[10] In crafting the RPA the drafters and construers of the Act saw fit to allow a seller to breach the requirements of sections 2(a), (d), and (e) if it could prove that in so doing it was merely meeting the already preva-

---

7. This section states as follows:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
15 U.S.C. § 13(d).

8. *Section 2(e) states:*

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for

sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
15 U.S.C. § 13(e).

9. Section 2(f) provides "[t]hat it shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

10. Section 2(b) of the Robinson–Patman Act states in relevant part as follows:

Upon proof being made ... that there has been discrimination in price or services of facilities furnished, the burden of rebutting the prima facie case shall be upon the person charged ...: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.
15 U.S.C. § 13(b).

lent prices of a competitor. *Standard Oil Co. v. FTC*, 340 U.S. 231, 246, 71 S.Ct. 240, 248, 95 L.Ed. 239 (1951). This defense is the so-called "meeting competition" defense. It allows a seller to rebut a prima facie case of price discrimination, and therefore avoid liability, by showing that its discriminatory actions were taken in good faith to counter the actions of a competitor. *Id.* In effect, it gives a seller the right to economic "self-defense." *United States v. United States Gypsum Co.*, 438 U.S. 422, 450–51, 98 S.Ct. 2864, 2880, 57 L.Ed.2d 854 (1978) (quoting *Standard Oil, supra*, 340 U.S. at 249–50, 71 S.Ct. at 249). Appellees asserted that any price discrimination on their part was economic self-defense, self-defense compelled by a competitive threat from the grey market.

Discovery ensued, but not without dispute. AA uncovered Minolta accounting evidence indicating that over the years Wolf Camera received from Minolta MDF benefits in the form of free goods worth at least $271,123 and free credit offsets for advertising and promotion worth at least $100,911, for a total value of $372,034. The discovered "numbers" also indicated that Wolf Camera received a sum of non–MDF benefits from Minolta in the amount of $26,961.[11] On April 1, 1987, in an effort to explore more of Minolta's data, AA filed a motion to compel discovery from Minolta and Lathrop. AA sought information from

certain Minolta accounts regarding discriminatory benefits provided Wolf Camera. It also sought information regarding a nationwide "key dealer" scheme and the benefits provided other "key dealers" throughout the nation. Both Minolta and Lathrop responded with motions for protective orders. They felt that discovery was better restricted to limited information regarding only AA and Wolf Camera. On October 2, 1987, the district court ruled in favor of Appellees, believing that "[t]he information sought is irrelevant to this litigation, overly burdensome to produce, and not likely to lead to the production of admissible evidence." A later-filed motion for reconsideration on this issue was denied.

■ When discovery came to a standstill, the parties filed various motions.[12] In a written memorandum and order entered December 30, 1988 the district court dismissed all motions as moot save Appellees' motions for summary judgment, which it granted. The court explained that summary judgment against AA was warranted because AA had failed to show that it had been harmed by anything done by the Appellees. As with other antitrust laws, private plaintiffs derive standing to sue for violations of the RPA via Clayton Act sections 4 and 16.[13] To recover under these sections a private plaintiff must show both the occurrence of an antitrust violation and

---

**11.** On the other hand, the accounting evidence showed that Minolta, through financial and other incentive programs, provided AA with benefits totaling $140,904: MDF in the amount of $60,458; non–MDF in the amount of $80,446.

**12.** AA filed four motions for partial summary judgment. Those motions sought judgment (1) rejecting Appellees' "meeting competition" defense; (2) establishing the element of interstate commerce; (3) establishing that the statute of limitations on the AA's claims was tolled by fraudulent concealment; and (4) finding that Appellees had violated sections 2(d) and 2(e) of the RPA. AA also filed a motion requesting the district court to certify for appeal its denial of AA's motion to compel discovery. Appellees responded with the following motions: (1) for summary judgment against AA's RPA claims; (2) for summary judgment against AA's state law claims; and (3) for the exclusion of AA's expert opinion damage study.

**13.** A private plaintiff's standing to sue for damages is authorized by section 4(a) of the Clayton

Act, as amended, which states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). A private plaintiff may also avail itself of injunctive relief. Clayton Act section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26.

Although AA's complaint requested both damages relief and injunctive relief, AA is no longer in a position to pursue an injunction. Thus, damages via section 4 are our only concern.

the incurrence of an antitrust injury. *See, e.g., Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (Section 16); *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (Section 4). *See also J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981) (involving the RPA). The court found deficient AA's showing in the latter regard.

In the court's view AA had failed to produce evidence that Wolf Camera was able to draw away profits or sales from AA on account of the price advantage it received from Minolta. The evidence presented cut against AA, according to the court, showing, first, that the amount of price benefit actually received by Wolf was *de minimis* when compared to its total dollar volume of Minolta purchases. The court found that the most Wolf Camera could have been advantaged was an amount summing to $350,540.[14] Over the $12,891,883 of Wolf Camera's Minolta purchases made during the period of price discrimination, this advantage translated to a mere $.03 on the dollar. Moreover, when consideration was given to the $60,458 of MDF benefits and $53,505 of net non-market development fund ("non–MDF") benefits Minolta gave AA over its $6,983,174 of purchases, this advantage deteriorated steadily "to less than one cent for every dollar [Wolf Camera] spent on Minolta goods." Second, even if the price difference was not *de minimis,* the evidence showed that price is a secondary factor in consumers' minds. The court found that price does not influence specialty camera purchasers so the pricing advantage afforded Wolf Camera was irrelevant. Third, even if the price did matter to specialty camera consumers, it did not influence them in this case. The price advantage given Wolf was not passed on to consumers, according to the court, but was used to increase advertising and other promotions.

Fourth, AA could not suffer antitrust injury because its profit margin on Minolta products was higher than its profit margins on other products. That margin stayed high during the period of discrimination, as did AA's retail prices on Minolta goods. Fifth, the court did not think that Wolf Camera and AA were competitors in Florida, although both had stores there, yet the profit margin derived by AA on its sales of Minolta products in Florida were the same as those derived in Georgia. This showed that AA was not injured in Georgia. Sixth, Minolta products apprised only 18% of Appellants total sales, thus "minimizing" any injury AA may have suffered. Lastly, whatever loss AA suffered was due not to the price discrimination, but to other reasons, such as its faulty computer system and poor management decision to expand in Florida. All of this proved that AA had not experienced the appropriate injury. Summary judgment, therefore, was required.

The court did not rest its judgment solely on its antitrust injury analysis. It noted additional reasons why summary judgment against AA was proper. First, as to the sections 2(d) and 2(e) claims, the court concluded that the terms and services offered AA and Wolf Camera by Minolta were "proportionally equal" because AA had received from Minolta certain non–MDF benefits relating to extended financing and generous return policies. This finding mandated summary judgment. Second, as to all of the RPA claims, the court found that the Appellees had proved that the price discrimination was caused by Minolta's need to meet competition. The court found that a grey market for Minolta products existed and that Wolf Camera had made Minolta aware that it would buy from such a market. The court felt that Minolta's discriminatory program was a reasonable response to this grey market threat, and thus its discrimination was excusable

---

**14.** Appellees "conceded" for the purposes of summary judgment AA's calculation of price discrimination (based as it was on only discovered MDF accounts). They then argued, however, that the total should sum to $350,540, not $372,034. The Appellees ignored about $21,500 worth of advertising benefits granted Wolf Camera that did not appear in the accounts until after April 30, 1986. They asserted that these benefits were provided Wolf Camera after the "relevant period." The district court adopted the Appellees' view.

via RPA section 2(b). This finding also mandated summary judgment.[15]

## II.

The Robinson–Patman Act was enacted into law in 1936. It amended the Clayton Act's regulation of price discrimination by making its scope more inclusive and its standards much tougher. The RPA's enactment was motivated by concerns for small, independent distributors, which in the 1930's were threatened by the arrival of chain stores. It marked "the high-water mark of the anti-chain-store movement." *R. Posner, The Robinson–Patman Act: Federal Regulation of Price Differences* 26 (1976). Although the Clayton Act had prohibited certain price discriminations, it was seen as ineffective in stopping the discriminatory prices granted chain stores by virtue of their size. *See H.R.Rep. No. 2287, 74th Cong., 2d Sess. 7 (1936); FTC v. Morton Salt Co.,* 334 U.S. 37, 43, 68 S.Ct. 822, 827, 92 L.Ed. 1196 (1948). So far as purchasing was concerned, this discrimination put the more normal "mom and pop" merchants of the day at a competitive disadvantage. Congress sought to alleviate the disadvantage by putting the new age retailing behemoths on a level "playing-field" with small independent merchants and businessmen. *See FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 908–09, 19 L.Ed.2d 1222 (1967); *FTC v. Henry Broch & Co.,* 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). The RPA was Congress's tool for doing so, for leveling competition between these types of competitors.

As is obvious from this brief summary of the RPA's history, "it is fairness, as Congress perceives it, that Robinson–Patman is all about." *Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1146–47 (D.C.Cir.1988). The Act's goal is to abolish unwarranted favoritism among all functional competitors, big or small.[16] Its objective is to assure "that businessmen at the same functional level ... start on equal competitive footing so far as price is concerned"; *FTC v. Sun Oil Co.,* 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963); "to assure that all sellers regardless of size, competing directly for the same customers ... receive even-handed treatment from their suppliers"; *Fred Meyer, supra,* 390 U.S. at 356, 88 S.Ct. at 912.

In this case, the evenhanded treatment sought by the RPA is missing. In fact, favoritism abounds. The facts show that in selling to AA and Wolf Camera Minolta clearly favored Wolf Camera. The facts establish price discrimination on Minolta's part, for "a price discrimination within the meaning of [the RPA] is merely a price difference," *FTC v. Anheuser–Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960), and the facts demonstrate a difference in price between what Minolta charged Wolf Camera and what Minolta charged AA. Making this clear is a comparison of ratios based on the documented benefits received from Minolta by Wolf Camera and AA in relation to their purchases. The evidence indicates that Wolf Camera received $372,034 of documented benefits in relation to $12,891,883 of purchases; thus Wolf Camera's documented benefit/purchases ratio is .029, or about $.03 on the dollar. Using the $350,540 figure Appellees prefer, the ratio drops to about .027. When $26,961 of non–MDF benefits received by Wolf Camera is added, these ratios are about .031 and .029, respectively. AA's ratio, based on MDF benefits

---

**15.** Following from the court's RPA conclusions was its grant of summary judgment against AA's state law claim of tortious interference. With no antitrust injury or RPA "wrong," the court reasoned, there could be no claim. The court also concluded that AA's other state law claim—breach of implied covenant—must fail as well. The court held that Georgia law does not allow a claim for breach of implied covenant, if such a claim cannot be tied to a violation of an explicit contractual provision.

**16.** Though the birth of the RPA was motivated by a desire to place "big" purchasers on par with "small" ones, the Act's applicability is not limited to big buyer/small buyer cases. *Boise Cascade, supra,* at 1139 n. 11. "[It] 'is of general applicability and prohibits discriminations generally.'" *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 436, 103 S.Ct. 1282, 1289, 75 L.Ed.2d 174 (1983) (quoting *FTC v. Sun Oil Co.,* 371 U.S. 505, 522, 83 S.Ct. 358, 368, 9 L.Ed.2d 466 (1963)).

received of $60,458 and purchases of $6,983,174 is about .0087, or less than $.01 on the dollar. Thus, the competitors' benefit/purchases ratios are not equal. They show at the very least that Wolf Camera owned a two cent per dollar advantage in purchasing. This advantage remains even under a best-case scenario for the Appellees, when $80,446 of non-MDF benefits purportedly received by AA are taken into account. AA's ratio rises to about .02, still one cent per dollar behind Wolf Camera's. When the numbers are crunched using other evidence of benefits, such as the testimony of Grabowski, the price discrimination—and Wolf Camera's purchasing advantage—becomes embarrassingly large.

Despite this and other substantial evidence hinting of Minolta's discrimination in favor of Wolf Camera (and, consequently, against AA), the court below granted summary judgment against AA's claims. The court seemed to believe that in spite of the evidence indicating favoritism its reasons, based as they were on the "proportionally equal" test of RPA sections 2(d) and (e), the "meeting competition" defense of RPA section 2(b), and the "antitrust injury" test of Clayton Act section 4, were enough to support summary judgment. While in theory this certainly is true, in the reality of this case, it is not.

### III.

We take the sections 2(d) and (e) issue first. The court below felt that no violation of these sections was possible because whatever Minolta provided Wolf Camera by way of benefits was available on "proportionally equal terms" to AA as well. Even though the opportunity afforded Wolf Camera to obtain certain advertising, promotional, and other benefits was not afforded AA, the court apparently felt that the two competitors had access to similar incentive programs because AA could and did participate in a Minolta program that provided AA with financial help.

■ Yet sections 2(d) and (e) require something more than access to different incentive programs before their "proportionally equal" standard is met. The sections' language requires that purchasers be given an equal opportunity to participate in certain types of seller programs relating to the resale of products, such as advertising and promotional programs, and that the benefits under those programs be disbursed on equal terms to purchasers in proportion to some objective value of their participation. *See FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 358–59, 88 S.Ct. 904, 913, 19 L.Ed.2d 1222 (1967) (Fortas, J., concurring). *See also* FTC Guides for Advertising Allowances and Other Merchandising Payments and Services, 1 Trade Reg.Rep. (CCH) 6072 (1960). Such a program may be one, for example, where an advertising fund is made available by a supplier to its retail-trade customers on a basis proportional to the dollar amount of the supplier's goods purchased by each retailer, the fund's monies to be expended up to each retailer's earned limit according to the retailer's actual resale advertising. *See F. Rowe, Price Discrimination Under the Robinson–Patman Act* 407 (1962). But the disputed fact situation facing us here does not present such a program, or anything like it. The situation presented here is one in which AA's ability to partake in certain schemes involving Wolf Camera was *completely foreclosed:* AA could not participate in advertising, promotional, and other resale schemes that funneled Wolf Camera benefits of at least $100,911.[17] This hardly seems to fulfill the "guiding ideal" that motivated the RPA: "the preservation of *equality of opportunity* as far as possible to all who are usefully employed in the service of distribution and production." *H.R.Rep.* No. 2287, 74th Cong., 2d Sess. 6 (1936), *quoted in FTC v.*

---

17. We count only those discovered MDF benefits which relate to advertising and promotion, for the $271,123 of MDF benefits relating to free goods are not "services or facilities" within the meaning of sections 2(d) or (e). "Services and facilities" under sections 2(d) and (e) must be related to the resale of the product in issue, and Minolta's provision of free goods was not connected with the resale of Minolta equipment. *See, e.g., Fred Meyer, supra,* 390 U.S. at 355–57, 88 S.Ct. at 911–12.

*Sun Oil Co.,* 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963) (emphasis added). It does not fulfill the mandate of sections 2(d) and (e).

■ Putting this opportunity problem aside, we also find the financing program in which AA participated legally incomparable to the promotion programs doled out to Wolf. "Services and facilities" falling within the scope of sections 2(d) and (e) must relate to the resale of the supplier's goods. *See Fred Meyer, supra,* 390 U.S. at 355–57, 88 S.Ct. at 911–12. Generally, financing programs do not relate to the resale of the supplier's goods and therefore are not services and facilities within the meaning of sections 2(d) and (e). *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1328 (6th Cir.1983); *L & L Oil Co. v. Murphy Oil Corp.,* 674 F.2d 1113, 1119 & n. 7 (5th Cir.1982); *Skinner v. United States Steel Corp.,* 233 F.2d 762, 765 (5th Cir. 1956). Advertising and promotional programs are. *See FTC v. Simplicity Pattern Co., Inc.,* 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959); *Bouldis, supra,* at 1329. Where two types of programs are segregated in law and nonequivalent in fact, comparing them to determine whether the promotional programs were available on "proportionally equal terms" seems nonsensical. Moreover, comparing the two types of programs would be proper only if Wolf Camera could not participate in the financing program on proportionally equal terms with AA. This is so because AA could not participate in the promotional programs on proportionally equal terms with Wolf Camera. But there is nothing to suggest that the financing programs in which AA participated were not open and available to Wolf Camera; indeed, the evidence suggests otherwise, as Minolta gave both AA and Wolf Camera non-MDF benefits.

Even if we assume that the financing and promotional programs are legally comparable, we still encounter problems. The evidence indicates that benefits under those programs were not disbursed by Minolta on proportionally equal terms. The benefits AA derived from the programs it was allowed access to were woefully short of those derived by Wolf Camera. The minimum quantified value of benefits provided AA through Minolta's programs (MDF: $60,458; non-MDF: $80,446) simply was not comparable with the minimum quantified value of benefits provided Wolf Camera (MDF: $372,034; non-MDF: $26,-961). On a proportional basis, *i.e.,* per dollar of purchases, Wolf Camera received at least half again as much in the way of benefits as did AA.

■ On the sections 2(d) and (e) issue there seems to us, at the very least, " 'sufficient evidence to create a jury question.' " *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 580 (5th Cir.) (quoting *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 848 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981)), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). The lower court's "proportionally equal terms" conclusion simply is incapable of supporting its grant of summary judgment.

■ That conclusion, however, was but one arrow in the court's summary judgment quiver. The district court also concluded that the Appellees had established as a matter of law the meeting competition defense of RPA section 2(b). Of course, if the Appellees merely were meeting their competition in good faith they are entitled to summary judgment, the type and amount of their price discrimination notwithstanding.

To establish that they merely were meeting the competition, Appellees alleged that a grey market in Minolta goods existed in Atlanta, that Wolf Camera actively and regularly purchased in this market, that Wolf Camera made known to Minolta that it would buy its Minolta cameras out of this market if Minolta did not cut it special deals, and that Minolta's action in giving Wolf Camera across-the-line discriminatory price concessions was a good faith effort to meet the grey market threat. AA disputed all of this, and hotly so. The district court chose to ignore AA's disputation; it accepted Minolta's testimony *in toto.* It then

opined that summary judgment was appropriate.

We cannot agree with the district court's opinion. Under summary judgment a conclusion may not be established as a matter of law unless "no genuine issue as to any material fact" exists. *Fed.R.Civ.P.* 56(c). Yet in this case plenty of these genuine issues exist. We need not at this point lose ourselves in the facts. We merely pause to note that significant questions are present concerning, among other things, the extent and impact of the grey market for Minolta goods in Atlanta and elsewhere throughout the southeast, the good faith nature of the alleged investigation Minolta made into grey market conditions, *see FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 758–59, 65 S.Ct. 971, 976, 89 L.Ed. 1338 (1945); *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 392 (8th Cir.1987), the propriety of its rather generalized response to the purported competition, *see Staley Mfg.*, *supra*, 324 U.S. at 753, 758–59, 65 S.Ct. at 975, 977, and the actual *purpose* which lies behind its price discrimination, *see Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 439, 103 S.Ct. 1282, 1291, 75 L.Ed.2d 174 (1983).

Moreover, under summary judgment involving section 2(b) a legal conclusion that the meeting competition defense has been established is rarely, if ever, reachable. Even in the absence of "allegations to the contrary" that tend to refute the establishment of the defense, certain factors combine to force section 2(b) issues to trial. *See Falls City, supra*, at 451, 103 S.Ct. at 1297. First, the party proposing a grant of summary judgment in its favor—here, the Appellees—bears the initial burden of showing that the summary judgment standard is met. *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). In the normal course of affairs this initial burden is satisfied when the summary judgment movant points out that a claim or issue is not supported by evidence sufficient enough "to require a [factfinder] to resolve the parties' differing versions of the truth."

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). But in the normal course of affairs the summary judgment movant does not bear the burden of proof at trial. Here our movant does, for "the statute places the burden of establishing the defense on the [defendant] not the [plaintiff]." *Falls City, supra*, 460 U.S. at 451, 103 S.Ct. at 1297. As is well established, in a summary judgment proceeding the party against whom the burden of proof falls at trial faces a challenge more difficult than otherwise. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Here the Appellees must do more than put the issue into genuine doubt; indeed, they must remove genuine doubt from the issue altogether. Second, the test for establishing the section 2(b) defense makes the removal of genuine doubt well nigh impossible. The test for establishing the defense is particularly fact-bound. *United States v. United States Gypsum Co.*, 438 U.S. 422, 455, 98 S.Ct. 2864, 2882, 57 L.Ed.2d 854 (1978). Whether section 2(b) is met depends on " 'the facts and circumstances of the particular case.' " *Falls City, supra*, 460 U.S. at 441, 103 S.Ct. at 1292 (quoting *United States Gypsum, supra*, 438 U.S. at 454, 98 S.Ct. at 2882) (emphasis added). A seller is required to " 'show the existence *of facts* which would lead a reasonable and prudent person to believe that the granting of a lower price would *in fact* meet the equally low price of a competitor.' " *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 82, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979) (quoting *Staley Mfg.*, *supra*, 324 U.S. at 759–60, 65 S.Ct. at 977) (emphasis added). As the standards suggest, these facts are more attuned with a jury's discovery capabilities than a judge's, particularly so in a complex antitrust context like the present one. Furthermore, the concept of good faith lies at the core of the defense. *United States Gypsum, supra*, 438 U.S. at 454, 98 S.Ct. at 2882. Like the concept of "good faith" in other legal standards, the concept here concerns itself with the *belief* of those invoking its protec-

**1426**

tion. *See id.*, at 453, 98 S.Ct. at 2881. Thus, issues of credibility are inherently bound up with a decision on the section 2(b) defense and in a summary judgment proceeding, of course, issues of credibility are beyond a judge's ken.

Altogether, these factors weigh heavily against any attempt to dispose of section 2(b) issues on summary judgment. Their weight, along with that of the disputed facts, is too much for the lower court's attempt in this case. Although "[t]here is evidence in the record that might support an inference that [the section 2(b) ] requirements were met, whether to draw that inference is a question for the trier of fact, not th[e] [c]ourt." *Falls City, supra*, 460 U.S. at 451, 103 S.Ct. at 1297. Thus, the section 2(b) issues before us are not destined for summary disposal.

■ With the subsection (b), (d), and (e) issues out of the way, we are ready to address the final and main ground supporting the lower court's grant of summary judgment: that AA failed to raise a genuine issue of antitrust injury. The district court found the case devoid of any evidence showing an antitrust injury. We think such evidence exists, however, evidence creating a genuine issue of material fact about whether an antitrust injury was inflicted upon AA.

Antitrust injury, which in this Circuit has been coined "the fact of damage," *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir.1978), or "cognizable injury," *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974), needs for its establishment a showing that the plaintiff is injured in some measurable amount, the injury caused by an improper effect "flowing" from the defendant's antitrust violation. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1988), *cert. granted*, — U.S. —, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989). As can be seen, the fact of damage and its cause are intertwined in the antitrust injury concept. The fact of damage is made out upon proof that the plaintiff's level of profits or sales or its present value is or was less than it otherwise would have been absent some intervening cause. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580; *Hasbrouck, supra*, at 1042. Such a showing presents no problem in this case: AA lost a whole market in Minolta camera sales, the pecuniary effects of which were quantified by its economics expert.[18]

18. The lower court seemed to find that AA failed to establish injury at all, much less antitrust injury. The court found that the discriminatory benefits received by Wolf Camera were not passed on in the form of lower prices to its consumers and that AA never lowered prices to compete with Wolf Camera. Moreover, the lower court found from the evidence that AA's profit margins on Minolta products were comparable with or higher than those on its other products, and stayed that way throughout the period of discrimination. It apparently concluded from these findings that AA had suffered no loss of sales or profits and, consequently, that no damage had been sustained.

Such a conclusion is a *non sequitur.* Wolf Camera may not have passed on its discriminatory benefits in the form of lower prices, although we think the evidence on this is mixed at best. But lower resale prices are not necessary to establish injury. The evidence shows that discretionary dollars in the Atlanta specialty camera store industry were most often chan-

nelled into store-specific advertising rather than into investments in price cuts. Sales were gained not by cutting prices but by aggressive advertising or product/service enhancement. The evidence, more specifically, shows that Wolf Camera was an avid pursuer of marketing expense and enhanced service and, indeed, that it directed most of its discriminatory advantage into these areas of demand management, thereby expanding its sales at AA's expense. Although price is nice, it is this effect on sales that directs the injury inquiry. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. at 437–38, 103 S.Ct. at 1290 (speaking of diverted sales); *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d at 386–87 (speaking of injury through loss of potential customers).

That AA's product margins on Minolta goods remained comparable with those on its other goods or that AA did not lower its prices on Minolta goods (which is to say the same thing) is not critical in establishing injury, for a firm's profits are the product of an equation multiply-

The causation question is a little more involved. It asks for something other than an inquiry into whether an antitrust violation has put a plaintiff in a worse position than it otherwise would have been in. *See Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 486, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977). Often an antitrust-violating action has effects beneficial as well as banned. The causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation—as opposed to the beneficial ones—led to plaintiff's harm. *Brunswick, supra,* at 489, 97 S.Ct. at 697. In many cases this distinction makes a difference. *See id.; Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). This is so because in many cases the "injury to competition" an antitrust law was established to prevent is different from an "injury to competitors" that a breach (or nonbreach) of that law may effect. *See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325 (7th Cir.1986). In those cases a competitor cannot complain if injured unless the injury flows from anti-competitive, not anti-competitor, effects.

With secondary-line RPA violations the competition/competitor distinction tends to fade. *See FTC v. Morton Salt Co.,* 334 U.S. 37, 49–50, 68 S.Ct. 822, 830, 92 L.Ed. 1196 (1948) (concerning competitive injury); *Foremost Dairies, Inc. v. FTC,* 348 F.2d 674, 678 (5th Cir.) (same), *cert. denied,* 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965). As a price discrimination incipiency statute designed to "catch the weed in the seed," *S.Rep. No.* 1502, 74th Cong., 2d Sess. 4 (1936), the injury to secondary-line competition the RPA seeks to prevent is analogous, if not identical, to an injury to competitors of a favored buyer. *See H.R. Rep. No.* 2287, 74th Cong., 2d Sess. 8

(1936). *See also Morton Salt, supra,* 334 U.S. at 46–50, 68 S.Ct. at 828–30; *Corn Prod. Ref. Co. v. FTC,* 324 U.S. 726, 738–39, 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945). The effects from which the RPA injury may flow, then, are the effects one would expect to injure competitors on the wrong end of a supplier's price discrimination scheme. These effects include a lowering of price by a favored purchaser. They also include a favored purchaser's effectuation of some other means by which it uses price discrimination benefits to lure from its rivals sales or profits or present value; for example, by increasing some expenditure that ultimately leads to a lower price, enhanced product, or extra promotion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1480 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). *Cf. Foremost Dairies, supra,* at 680.

In final form the RPA causation question asks whether some or all of the plaintiff's injury was derived from or materially furthered [19] by a competitive advantage bestowed upon a favored purchaser through its receipt of discriminatory prices. *See Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163, 1171 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). The evidence in this case is enough to put the question genuinely in dispute, especially in light of the substantial evidence of Appellees' wrongdoing. *See J. Truett Payne, supra,* 451 U.S. at 565–67, 101 S.Ct. at 1929–30. That evidence suggests that Minolta gave Wolf Camera a purchasing advantage over AA and that Wolf Camera channeled its purchasing advantage into a promotional advantage, unmatched by AA, in an industry where store sales are heavily influenced by promotional expense. It shows conclusively that during the time of this discrimination AA's share of the market dropped precipitously, that

---

ing profit margin and dollar volume of sales. Where the dollar volume of sales drops, as it did for AA in a most dramatic fashion, a firm's amount of profit drops regardless of stability in its profit margin. And it is the firm's *profits,* not its *profit margin,* that the law is concerned with.

**19.** For damages "[i]t is enough that the illegality is shown to be a *material cause* of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden." *Zenith Radio Corp., supra,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571–72 n. 9.

share being absorbed by Wolf Camera. And it contains, among other things, the report of an economic expert concluding that the advantage afforded Wolf Camera by the discrimination *caused* AA injury, and in quite a substantial amount. There is enough here for a jury to find an antitrust injury caused by Appellees " 'as a matter of fact and with a fair degree of certainty.' " *See Chrysler Credit Corp., supra,* at 581 (quoting *Terrell, supra,* at 20). There is enough for a jury to find otherwise, too, but not so much to eliminate a triable issue.[20] At the very least the evidence gives rise to a reasonable inference that Appellees' misdeeds caused AA some harm. And where such a reasonable

inference is raised by the evidence, summary judgment is uncalled for. *Gossett v. Du-Ra-Kel Corp.,* 569 F.2d 869, 871 (5th Cir.1978); *Benton-Volvo-Metairie, Inc. v. Volvo S.W., Inc.,* 479 F.2d 135 (5th Cir. 1973).

## IV.

We turn now to some peripheral issues. They are easily dispatched. The lower court granted Wolf and Wolf Camera's motion for summary judgment against AA's section 2(f) claim. Its reason for so doing was that no claim can lie against a buyer under section 2(f) where no claim lies against a seller under other sections of the

---

**20.** This conclusion stands regardless of the specific concerns advanced by the lower court. The court felt that no injury could possibly arise from the amount of price discrimination involved in the case, which it called *de minimis.* But the *de minimis* doctrine, by which a price discrimination is held to be too inconsequential to have caused competitive injury under section 2(a) or actual injury under section 4, does not depend on the large or small amount of the price discrimination *per se.* It depends on the large or small *effect* that the price discrimination has on business rivalry. *See Lupia, supra,* at 1171. To illustrate, in a competitive market the smallest increment of price advantage to one competitor would theoretically allow it to capture from its rivals as much of a market share as its output allowed. The price advantage may be *de minimis,* but the effect of it is not. We are not suggesting that the market involved here is *perfectly* competitive, but it is imperfectly so, and even in such markets a little price discrimination can go a long way. *See Foremost Dairies, supra,* at 679 (dairy industry); *Shreveport Macaroni Mfg. Co. v. FTC,* 321 F.2d 404, 409 (5th Cir.1963), *cert. denied,* 375 U.S. 971, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964) (pasta industry). Indeed, AA's economic expert concluded that the competitive advantage given Wolf had a *substantial* effect on its ability to capture market share, and as far as we know the expert's conclusions constitute evidence. Thus, the lower court's *de minimis* objection cannot keep this issue from reaching the jury.

Nor can a variation on the *de minimis* theme relied on by the court: that no antitrust injury existed because Minolta products were only one line of many that AA carried. Simply because AA's injury derived from only one line of its products does not make that injury any less real. *See FTC v. Morton Salt Co.,* 334 U.S. at 49, 68 S.Ct. at 829. If this particular strain of the *de minimis* argument failed in *Morton Salt,* where a grocer's potential injury came only from price differentials affecting one product

amid thousands that it carried, it surely fails here.

The court also seemed to think that AA's injury could only be caused from price-lowering actions by Wolf Camera. But sales in the specialty camera industry are affected by more than price; they are affected by promotion and product as well. The court found as a matter of fact that Wolf Camera channeled most of its advantage into advertising and promotion, and it seems that it enhanced its product (photographic equipment *and* retail service combined) too. The evidence establishes that promotion and product enhancement were the primary factors affecting camera consumers' choice of sales outlet. Thus the fact that Wolf Camera did not lower its resale prices, even if true, by no means eliminates causation from jury consideration.

The court felt too that no genuine issue existed about AA's antitrust injury, or lack thereof, because AA was the cause of its losses, not Appellees. There can be no liability "when the injury is the result of the plaintiff's own competitive shortcomings, rather than a merely coincidental discrimination in price." *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 421 (8th Cir.1986). And it is true that AA had competitive shortcomings, including its faulty computer system and its decision to blunder about unprofitably in Florida. These shortcomings *could* easily have been the intervening cause of all AA's sales and profit losses or some part of them, of this there is no doubt. But whether the cause of all or some of AA's problems *actually was* AA's discrimination-based competitive disadvantage, AA's computer, AA's managers, all of these things or none of them, is a matter of educated inference that must be left for the jury. If it finds that Appellees' price discrimination was the cause of *some* of AA's injury, which is certainly a reasonable inference, Appellees will be "responsible to that extent." *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. at 437, 103 S.Ct. at 1290.

RPA. This reasoning is unassailable. *See Great Atl. & Pac. Tea Co. v. FTC,* 440 U.S. 69, 76–77, 99 S.Ct. 925, 931, 59 L.Ed.2d 153 (1979); *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 70–71, 73 S.Ct. 1017, 1022–23, 97 L.Ed. 1454 (1953); *Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1129 (D.C.Cir.1988). But our analysis has determined that the lower court was in error on issues relating to seller liability. With this prong of its argument gone, the district court's conclusion concerning section 2(f) is no longer valid. Accordingly, AA's section 2(f) count must be revived.

The same can be said of AA's state law claim for tortious interference. The court granted summary judgment on this count relying on the strength of its previous conclusions regarding the RPA and section 4 of the Clayton Act. Because those conclusions have been undermined, the court's summary judgment on the tortious interference count is likewise undermined.

■ AA's complaint also included a state law claim asserting that Minolta had an ongoing contractual relationship with AA throughout the period of the alleged price discrimination, that an implied covenant of good faith and fair dealing was part of this contract, and that Minolta's discriminatory actions breached this covenant. AA did not allege, however, that any explicit term in its contracts with Minolta was breached. Thus, AA sought to set the implied covenant up as an independent term in its contracts, subject to breach apart from any other. The district court rejected this attempt, and rightly so, for the "covenant" is not an independent contract term. *Management Assistance, Inc. v. Computer Dimensions, Inc.,* 546 F.Supp. 666 (N.D. Ga.1982), *aff'd without opinion sub nom., Computer Dimensions, Inc. v. Basic Four, Inc.,* 747 F.2d 708 (11th Cir.1984). It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure. See Smithloff v. Benson,* 173 Ga.App. 870, 328 S.E.2d 759 (1985); *Koets, Inc. v. Benveniste,* 169 Ga.App. 352, 354, 312 S.E.2d 846 (1983) *aff'd,* 252 Ga. 520, 314 S.E.2d 912 (1984); *Fulton Nat'l Bank v. Willis Denney Ford, Inc.,* 154 Ga.App. 846, 848–49, 269 S.E.2d 916 (1980); *Carmichael v. Gonzalez,* 107 Ga.App. 746, 131 S.E.2d 149 (1963). But it is not an undertaking that can be breached apart from those terms. Summary judgment on this count was appropriate.

■ One final issue. The district court precluded AA from pursuing discovery of information concerning discriminatory benefits that Minolta afforded Wolf Camera out of certain MDF accounts and discriminatory benefits that Minolta afforded other "key dealers" throughout the nation. It did so, in part, on the theory that the information sought was irrelevant to the litigation. But the information sought is relevant. Information showing that discriminatory benefits flowed not only to Wolf Camera but to other "key dealers" throughout the nation would go far in discrediting any attempt by Minolta to assert that the discriminatory benefits it afforded Wolf Camera were a "good faith" effort to meet competition in the Atlanta or southeast market. And information leading to a further quantification of the amount of price discrimination involved in Minolta's scheme would tend to clarify and perhaps refute any claims Appellees might raise relating to the competitive injury requirement of section 2(a), which concerns itself with injury to competition and competitors *in general,* not just injury to AA.[21]

In blocking the discovery of information such as this, the district court abused its discretion. We are not saying that the

---

21. Even when AA's injury alone is considered, the district court's limitation on discovery was too severe. The court found that the Atlanta market was the only relevant market in this case, but this finding does not comport with the facts. AA had stores not only in Atlanta, but throughout the southeast United States and particularly in Florida. Grabowski's testimony alleged that Minolta channeled "key dealer" benefits to Florida camera stores other than AA, including Wolf Camera's Florida stores. The evidence is inconclusive with regard to the extent of competition, in Florida, between AA and the other key-dealer retailers. Thus, these benefits *may have injured* AA in Florida, or they may have been used to create a fund for injuring AA in Atlanta. Discovery should have been allowed to determine if this was the case.

Moreover, a narrow reading of AA's complaint cannot limit the relevant market in this

district court was wrong to be concerned about elements of vexatiousness that may be lurking in this lawsuit, nor do we think that it should have given AA *carte blanche* in pursuing discovery. We say only that its order of October 2, 1987 was in error because it did not properly take into account the type of information that has value under the "key dealer" theory AA presented.

## V.

In sum, we conclude that the district court abused its discretion with respect to the discovery order of October 2, 1987. We also conclude that summary judgment was improper with respect to all issues except the one concerning the implied covenant of good faith and fair dealing. Besides that one, the issues involved in this appeal are all "genuine issues of material fact," *Fed. R.Civ.P.* 56(c), for which a trial would serve a useful purpose. Accordingly, they must be submitted to the jury.[22]

For the foregoing reasons, the judgment of the district court is REVERSED, and its order entered October 2, 1987 is VACATED. The case is REMANDED for further proceedings consistent with this opinion. 

case solely to Atlanta. Although the complaint naturally focuses on Minolta and Wolf Camera in the Atlanta market, it does not do so to the point of limiting discovery only to Wolf Camera in the Atlanta market. It seems to us that the district court's focus on the Atlanta market was too narrow. At least for the purposes of discovery, AA should have been allowed to find information on price discrimination affecting all of its stores, even those outside of Atlanta.

**22.** Our analysis on summary judgment was based on a normal reading of the Rule 56 standard. Appellees argue that our analysis should have been based on a stricter reading. They assert that the Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) evinces a mandate for courts to use a stricter-than-normal summary judgment standard in antitrust cases, a standard that imposes extra burdens on a plaintiff, one that would lead us in this case to uphold the district court. We cannot agree with the Appellees' assertion, how-

ever, for *Matsushita* calls for no such deviation from the norm embodied in *Fed.R.Civ.P.* 56.

In *Matsushita* the Supreme Court warned courts in summary judgment proceedings to be skeptical when presented antitrust allegations that clash with established economic theory. Such skepticism is well warranted because established economic theory indicates how rational entities generally act, and most antitrust cases involve the acts of rational entities. Generalizing, *Matsushita* warns courts to be wary of drawing irrational inferences in summary judgment proceedings, for irrational inferences fail to create genuine issues of material fact. But such a doctrine is hardly novel; and it certainly does not modify the standard for summary judgment. *Matsushita* said nothing new, it merely informed the proper Rule 56 standard by placing it in a complex antitrust context (that of a predatory pricing conspiracy).

We did not base our conclusions on irrational inferences, of course. Thus, *Matsushita* provides Appellees with little help.