**Randal TART, Plaintiff,**

v.

**IMV ENERGY SYSTEMS OF AMERICA, INC., Defendant.**

**No. 1:03 CV 1479 WSD.**

United States District Court, N.D. Georgia, Atlanta Division.

March 31, 2005.

Gary Richard Kessler, Irvin Stanford & Kessler, Atlanta, GA, for plaintiff.

Margaret Hutchins Campbell, Anthony Craig Cleland, Ogletree Deakins Nash Smoak & Stewart, Atlanta, GA, for defendant.

## ORDER

DUFFEY, District Judge.

This matter is before the Court on Plaintiff Randal Tart's ("Plaintiff") Motion for Summary Judgment [36], Defendant IMV Energy Systems of America, Inc.'s ("Defendant" or the "Company") Memorandum in Opposition to Plaintiff's Motion for Summary Judgment [43], Plaintiff's Reply Brief in Support of his Motion for Summary Judgment [48], Defendant's Motion for Summary Judgment [39], Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [44], and Defendant's Reply in Support of Summary Judgment Motion [47].

## I. BACKGROUND

### A. *The Parties*

Plaintiff has a degree in Mechanical Engineering from North Carolina State University and a Masters in Business Education from Duke University. (Pl.'s Statement of Facts ¶ 1.) He has worked in the power protection industry since 1987 and was employed by C & D Industries ("C & D") for several years prior to his employment at the Company. (*Id.* ¶¶ 2–3.) Plaintiff was the top sales person at C & D, earning approximately $180,000 per year. (*Id.* ¶ 3.)

In 1998, IMV Systems ("IMV"), a Swiss company providing uninterruptible power supply ("UPS")[1] products and services, decided to enter the U.S. market. (Def.'s Statement of Facts ¶ 1.) To do so, in July 1999, IMV incorporated Defendant as a Delaware corporation doing business in the State of Georgia. (*Id.* ¶ 2.) In December 1999, Defendant entered into a preliminary agreement with Elox, a North Carolina company, to set up a manufacturing facility in the United States. (*Id.* ¶ 4.) In February 2000, Defendant acquired Power Maintenance International ("PMI"), a Texas company, to provide service and support for its U.S. products. (*Id.* ¶ 5.) In May 2000, Defendant entered into a letter of intent with Elox, made financial investments to set up manufacturing at Elox, and sent employees from Europe to Elox's facility. (*Id.* ¶¶ 6–7.) In June 2000, Defendant purchased land near PMI for a manufacturing facility. (*Id.* ¶ 8.)

In September 2000, General Electric ("GE") approached IMV about acquiring the company. (*Id.* ¶ 9.) In anticipation of the acquisition, in October 2000, GE and IMV entered into a confidentiality agreement, which prevented Defendant from making expenditures in excess of $2000

---

**1.** UPS products prevent computer systems from losing power during a disruption.

without first obtaining GE's permission, and prevented IMV from disclosing the potential acquisition. (*Id.* ¶¶ 10–11.) In February 2001, IMV announced GE was conducting due diligence to acquire IMV, and in July 2001, GE closed on its acquisition of IMV. (*Id.* ¶¶ 12–13.)

### B. *Plaintiff's Employment With The Company*

Plaintiff was one of Defendant's first four employees in the United States, serving as Defendant's Vice President of Marketing and Sales for the eastern United States. (Def.'s Statement of Facts ¶¶ 14–15.) Plaintiff had more than twelve years of experience in the UPS industry when Defendant recruited him, including employment at Chloride Power Electronics where he aided in bringing a European product into the U.S. market. (*Id.* ¶¶ 18–19.) Defendant's President, Jurg Schwerzmann ("Schwerzmann"), recruited Plaintiff to join the Company. (Pl.'s Statement of Facts ¶ 6.)

Before Plaintiff signed his employment agreement in April 2000, Plaintiff met with Schwerzmann, viewed Defendant's website and traveled to Switzerland to visit IMV's factory, where he spoke with IMV's personnel and engineers. (Def.'s Statement of Facts ¶¶ 24–26.) Defendant also provided Plaintiff with materials regarding Defendant's business and products, including several press releases that Plaintiff read before signing his employment agreement. (*Id.* ¶¶ 27–29.) Plaintiff signed his only written employment agreement with Defendant on April 25, 2000, and began his employment on June 1, 2000. (*Id.* ¶¶ 30–31, 33.) The terms of Plaintiff's incentive bonus plan were not agreed upon when he started working. (*Id.* ¶ 35.)

After Plaintiff began his employment at Defendant, Defendant had problems getting its remaining U.S. products UL[2] listed, experienced delays caused by design changes, and the "Internet bubble" began to burst. (*Id.* ¶¶ 37–39.) In April 2001, Defendant gave Plaintiff six-months notice, as required by his employment agreement, that his employment would end in October. (*Id.* ¶ 40.)

### C. *Alleged Misrepresentations*

Plaintiff alleges Defendant's representatives made numerous misrepresentations to induce Plaintiff to leave C & D to join the Company. These alleged misrepresentations concern: (1) available products for the U.S. market, (2) production facilities in the United States, (3) Defendant's financial commitment to U.S. market development, (4) Defendant's relationship with IBM, (5) Defendant's business partners, and (6) Plaintiff's benefits.

#### 1. *Existing Products In United States Market*

Plaintiff claims Defendant misrepresented the products available for sale in the United States in two separate press releases. A September 22, 1999 press release states, in part:

> Jurg P. Schwerzmann, chief operating officer of IMV Holding, Ltd. who will also serve as president of IMV Energy Systems of America, said "Our well planned approach to the North American market will offer potential U.S. business partners the most complete solution 'model' for safe and managed power anywhere." .... All IMV UPS systems are UL-listed .... SitePro is an intelligent on-line UPS family with three-phase ratings of 10–500 KVA.[3]

---

2. "UL" refers to "Underwriting Laboratories, Inc.," an American laboratory that certifies certain electronic products. (*See* Schwerzmann Depo. Tr. at 17.)

3. "Kilo volt ampere" ("KVA") is the power rating for UPS units. (Def.'s Mot. for Summ. J. at 11.)

(Pl.'s Statement of Facts ¶¶ 10–11.) An October 12, 1999 press release also allegedly represented Defendant had 10–500 KVA systems for sale in the United States.

When Defendant recruited Plaintiff, the Company had, at most, only products up to 40 KVA available for sale or that were UL certified. (Def.'s Statement of Facts ¶ 21.) By September 2000, Defendant had units up to 120 KVA which were UL listed, or were in the UL-listing process. Being in the listing process enabled Defendant to market them as listed. (Def.'s Statement of Facts ¶¶ 21, 34.) Plaintiff claims a lack of a complete product line and UL certification made Defendant's products difficult to sell. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7.)

Plaintiff also asserts Defendant's Site-Pro line of products were not FCC compliant. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 7.) This allegedly contradicts Defendant's Site Pro literature, given to Plaintiff while he was being recruited, that stated the Site Pro product complied with FCC requirements. According to Plaintiff, the lack of FCC compliance made the products difficult to sell. (*Id.*)

### 2. *North Carolina Facility*

Plaintiff claims he was told by Schwerzmann and the Company that Defendant had a North Carolina manufacturing facility. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 8.) A press release dated May 22, 2000, states, in part:

> In addition to establishing a manufacturing facility in North Carolina, IMV recently announced that Mesquite, Texas-based power maintenance international (PMI) would provide global maintenance services for IMV products.

(Pl.'s Statement of Facts ¶ 21.) Plaintiff claims having a United States manufacturer was important to Plaintiff from a sales perspective because of "reduced lead time" for manufacturing and the desirability of domestic products among purchasers. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 9.) Defendant had not established a manufacturing facility in North Carolina. Rather, in December 1999, Defendant had only entered into a preliminary agreement with Elox, a North Carolina company, to set up a manufacturing facility in the United States. (Def.'s Statement of Facts ¶ 4.) While Defendant had in May 2000, entered into a letter of intent with Elox, made financial investments to set up manufacturing at Elox, and sent employees from Europe to Elox's facility (*id.* ¶¶ 6–7.), the Company ultimately decided not to manufacture in North Carolina. (*See* Schwerzmann Depo. Tr. at 99–100.)

### 3. *Commitment Of Capital*

Plaintiff claims he was told on May 7, 2000, that $7.5 million had been raised by IMV specifically for Defendant's United States venture. He learned later the money was not spent for this purpose. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 10, 18.)

### 4. *IBM Business Relationship*

Plaintiff alleges he was shown a February 14, 2000 press release which states, in part, "IMV Energy Systems of America (IMV) was recently ranked as one of IBM's top suppliers." (Pl.'s Statement of Facts ¶ 25.) After Plaintiff began working for Defendant, Plaintiff discovered the Company had not sold any products to IBM. (Pl.'s Statement of Facts ¶ 27.) He learned only IMV's European division, and not the Defendant, had a strong relationship with IBM. (*Id.* ¶ 26.)

### 5. *Salary And Benefits After GE's Acquisition Of IMV*

While Defendant was recruiting Plaintiff to join the Company, Plaintiff told Defendant it was important to him that in-vitro fertilization be covered by his health plan. Schwerzmann promised Plaintiff he would have in-vitro benefits as long as Plaintiff

was employed by the Company. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 11.) Defendant provided medical benefits for fertility treatments until July 2001 when GE acquired Defendant. (Pl.'s Statement of Facts ¶¶ 33–34; Def.'s Statement of Facts ¶ 42.) Under GE's plan, Plaintiff no longer received in-vitro health benefits. Consequently, Plaintiff spent over $65,000 for in-vitro expenses. (Id. ¶ 36.) GE also did not provide Plaintiff with long-term disability or 401(k) coverage. (Pl.'s Statement of Facts ¶ 35.)

Plaintiff also claims he did everything required to earn a $10,000 bonus for a "Chevron contract," but did not receive the bonus. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 11.)

E. *Procedural History*

On April 24, 2003, Plaintiff filed suit against Defendant in the Superior Court of Fulton County, Georgia. Defendant removed the action on May 23, 2003, on the basis of federal question and diversity jurisdiction. On June 16, 2003, Plaintiff moved to amend the Complaint, and on July 18, 2003, Plaintiff filed the First Amended Complaint [14]. Plaintiff asserts the following causes of action: (1) fraudulent misrepresentation and fraudulent inducement, (2) negligent misrepresentation, (3) breach of contract, and (4) breach of the implied covenant of good faith and fair dealing. (*See* Am. Compl. at 4–6.) Plaintiff seeks damages for economic losses allegedly suffered as a result of Defendant's alleged fraudulent conduct and breach of contract, compensatory and punitive damages for Defendant's alleged fraudulent conduct, and various other forms of relief. (*Id.* at 7.) Defendant filed a counterclaim for (1) misappropriation of trade secrets, (2) computer theft, and (3) replevin and conversion. (*See* Am. Answer & Counterclaim [13] at 14.) Defendant requests Plaintiff be ordered to return all of Defendant's property. (*Id.*)

Plaintiff filed his Motion for Summary Judgment claiming the undisputed evidence demonstrates he is entitled to judgment as a matter of law on his claims of fraudulent misrepresentation, breach of the implied covenant of good faith and fair dealing, and breach of contract. Plaintiff also seeks summary judgment on Defendant's counterclaim.

Defendant moves for summary judgment on all of Plaintiff's claims. First, Defendant claims Plaintiff's state-law claims regarding his alleged right to receive health benefits are preempted by ERISA. Second, Defendant asserts Plaintiff's fraud claims should be dismissed because Plaintiff has failed to produce evidence demonstrating that (i) Defendant's representations are anything more than "fraud in hindsight" or corporate "puffing," (ii) Plaintiff reasonably relied on any representation, (iii) Defendant acted with intent to deceive and harm Plaintiff, or (iv) Plaintiff exercised due diligence. Defendant also claims Plaintiff waived any objection he had to any alleged fraud. Third, Defendant asserts Plaintiff's negligent misrepresentation claims fail for the same reason his fraud claims fail. Fourth, Defendant asserts Plaintiff's breach of implied covenant of good faith and fair dealing claim fails because Georgia does not recognize this cause of action, Plaintiff was an at-will employee, and Defendant was not "intentionally deceptive." Finally, Defendant argues Plaintiff's breach of contract claim fails because Plaintiff's employment could be terminated at will and there was no breach of his employment agreement.

II. **DISCUSSION**

A. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir.1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir.1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." *Id.*

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir.1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." *Graham*, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. ERISA Preemption

■ Plaintiff claims Defendant "promised" the Company would provide medical benefits throughout his employment to cover his spouse's in-vitro medical expenses. (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 12.) While Defendant admits it promised Plaintiff in-vitro medical expenses would be covered by Defendant in its health benefits plan, Defendant argues Plaintiff's state-law claims alleging entitlement to these benefits are preempted by ERISA. Plaintiff argues that preemption does not apply because the agreement to provide in-vitro benefits was "separate and distinct from the medical insurance benefit plan upon which IMV claims preemption under ERISA . . . ." (*Id.*)

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, sets forth a comprehensive federal scheme for the enforcement of employee benefit plans. The policies underlying ERISA would be undermined if plan participants or beneficiaries were free to bypass the ERISA system and obtain remedies under state law that were rejected by Congress in ERISA. *See Sanson v. General Motors Corp.*, 966 F.2d 618, 622 (11th Cir.1992). "The express preemptive language used by Congress in ERISA is broad in scope—'all State laws insofar as they . . . relate to any employee benefit plan' are preempted by ERISA." *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1293 (5th Cir.1989); *see also Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267 (11th Cir.2005) (" '[D]efensive' ERISA preemption . . . broadly 'supercede[s] any and all State laws insofar as they . . . *relate to* any [ERISA] plan.' ") (emphasis original) (quoting 29 U.S.C. § 1144(a)). Defensive preemption provides an affirmative defense to certain state-law allegations, and, where applicable, requires dismissal of state-law claims. *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1012 n. 6 (11th Cir.2003).

"A party's state law claim 'relates to' an ERISA benefit plan for the purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits. Where state law

claims of fraud and misrepresentation are based upon the failure of a covered plan to pay benefits, the state law claims have a nexus with the ERISA plan and its benefits system." *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1028 (11th Cir. 1997) (quotations and citations omitted).

*Franklin* applies here. Plaintiff in *Franklin* alleged she accepted a position at a new employer on the condition that her husband would continue to receive the same 24–hour home nursing care provided under her former employer's plan. Plaintiff claimed the new employer represented that plaintiff "would continue to enjoy the same level of care being provided to [plaintiff]'s husband [under the former employer's medical benefits plan] *and the care would not be reduced.*" *Id.* at 1027 (emphasis original). Plaintiff left her former employer and she became a member of her new employer's health benefits plan under which her husband continued to receive 24–hour home nursing care. The new employer was later acquired by another company. The acquiring company changed its health benefits plan and under the new plan, 24–hour home nursing care was eliminated. *Id.* at 1026.

In *Franklin*, plaintiff attempted to avoid ERISA preemption by characterizing her claim as one in which she alleged she had been fraudulently induced to enter employment with her new employer when she was promised continued 24–hour home nursing care for her husband. *Franklin* at 1028.

Plaintiff argued her state-law claims were not preempted because their "claims of fraud in the inducement do not sufficiently 'relate to' ERISA governed plans so as to come within the preemptive parameters of ERISA." *Id.* That is, they did not allege a violation of, nor seek relief under, the ERISA plan. *Id.* at 1027–28. She claimed that all of the events which are the subject of the complaint occurred prior to the commencement of her employment relationship and thus were not ERISA claims. *Id.* The Eleventh Circuit rejected plaintiff's arguments. It held that the "Supreme Court has given an expansive interpretation to the term 'relate to.' The court has held that a state law relates to an employee benefit plan 'if it has a connection with or reference to such a plan.'" *Id.* at 1028 (citations omitted).

The Eleventh Circuit stated further:

This court has also stated that "[a] party's state law claim 'relates to' an ERISA benefit plan for purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits." ... "[W]here state law claims of fraud and misrepresentation are based upon the failure of a covered plan to pay benefits, the state law claims have a nexus with the ERISA plan and its benefits system."

*Id.*[4]

Here, Plaintiff's claim is nearly identical to plaintiff's claims in *Franklin*. Plaintiff

---

4. The Court in *Franklin* was considering whether the District Court properly removed the case, which ordinarily involves the question whether there is complete preemption under 29 U.S.C. § 1132(a). Section 1132(a) provides the exclusive cause of action for the recovery of benefits governed in an ERISA plan. *Franklin* at 1028. Whether a state law claim is "related to" an ERISA plan is relevant under § 514(a). Section 514(a) provides a preemption defense to state law claims which "relate to" an ERISA plan. The effect

of § 514(a) is to prohibit a plaintiff from subjecting ERISA plans to various and differing state law causes of action requiring them instead to be asserted, if at all, as claims under the ERISA statute. Section 514(a) gives rise to what is known as "defensive preemption." There is some confusion in reconciling the complete and defensive preemption concepts. *Ervast* at 1013 n. 7. In *Cotton, supra,* this confusion was discussed. The *Cotton* court noted its decision in *Franklin* was not consistent with its opinion in

is seeking in-vitro medical benefits promised to him while he was being recruited to the Company. Upon joining the company, Plaintiff was provided with in-vitro benefits *under the Company's health benefits plan* until GE acquired the Company. After the acquisition, Plaintiff ceased to receive in-vitro benefits to which he believes he remained entitled. Under the law of this Circuit, Plaintiff's resulting claims under state law for health benefits are preempted by ERISA.

Plaintiff here, like the Plaintiff in *Franklin*, attempts to avoid preemption by claiming there was a "binding contract" that was "separate and distinct from the medical insurance benefit plan upon which IMV claims preemption under ERISA ...." (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 12.) Plaintiff argues his claim is distinguished from that brought in *Franklin*, where the employer "agreed only to transfer plaintiff's husband into defendant's employee welfare benefit plan," and the plan expressly permitted the employer to change the plan. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 14 (quotation and citation omitted).) [5]

This distinction is not persuasive. Plaintiff in *Franklin* similarly claimed the

*Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir.1999), which set forth the analysis required to determine whether complete preemption existed for federal jurisdiction purposes. The *Cotton* Court, in evaluating the decision in *Franklin*, stated that the *Franklin* Court correctly began its analysis by addressing whether complete preemption provided federal jurisdiction over the state claims at issue in *Franklin*. *Cotton* at 1288–89. The Court went on to say the remainder of the *Franklin* Court's analysis pertained to whether the *Franklin* plaintiff's claims were "related to" an employer benefits plan under § 514. This "related to" analysis is germane to whether defensive preemption exists. The *Cotton* Court noted that defensive preemption is broader than complete preemption, stating further that state law claims are not necessarily completely preempted for jurisdiction purposes just because they are preempted defensively. This discussion in *Cotton*, and the distinction between complete and defensive preemption, is most relevant where the Court is confronted with the question of federal jurisdiction, such as in considering whether there is an absence of complete preemption so as to require that a removed case be remanded. The case before this Court concerns whether Plaintiff's state law claim is defensively preempted. The Court's opinion in *Franklin* is relevant here because it provides the Eleventh Circuit's view on how to apply the "related to" clause in § 514(a) to determine if defensive preemption of a state law claim bars the claim. For that reason, and because *Franklin* involved a § 514(a) analysis of a state law fraud in the inducement claim, *Franklin* is helpful and persuasive.

5. In arguing that ERISA does not preempt his claims, Plaintiff relies on *Ervast*, 346 F.3d 1007. In *Ervast*, plaintiff brought a cause of action for breach of corporate fiduciary duty against his employer for failing to disclose it was considering a merger when he resigned and exercised his rights under the employer's stock benefit plan and rolled over the proceeds from his benefits election into an IRA account. Plaintiff claimed the merger was material information that should have been disclosed to him because it favorably affected the value of his benefits under the plan. *Id.* at 1015. The issue in *Ervast* was whether the case, filed in state court, could be removed to federal court because plaintiff's claims were preempted by ERISA. *Id.* at 1011. The *Ervast* Court specifically held that plaintiff's "allegations do not in any way involve a clarification of his rights, nor is he seeking to enforce his rights *under the terms* of the ESOP." *Id.* at 1015. His claim was rooted in his standing as a minority shareholder in the company, not that he was entitled to some benefit under an ERISA plan. *Id.* That is not the case here. Here, Plaintiff's claim is directly related to an ERISA plan and he is claiming entitlement to coverage under it, because plan coverage was promised to him, but later denied, like it was in *Franklin*. Defendant here claims defensive preemption. A state law claim is preempted when the claim is "related to" an ERISA plan. *Cotton* at 1288–89. Plaintiff's state law claims are "related to" an ERISA plan because he is demanding in vitro coverage under the plan. Under the plain language of § 514, *Franklin*, and *Cotton*, the claims are defensively preempted.

existence of a "side agreement" that plaintiff's benefits would not be modified. *Franklin* at 1029. The "side agreement" in *Franklin* is, in all relevant respects, the same as Plaintiff's alleged "separate and distinct" agreement with Defendant. *Id.* The *Franklin* Court specifically held "the written terms of a medical welfare plan cannot be modified by oral [or 'separate and distinct'] agreements," the "alleged misrepresentation relates directly to [the] medical benefits plan," and plaintiff's state-law claims are preempted. *Id.; see also Cefalu*, 871 F.2d at 1292–94 (ERISA preempted breach of contract claim against employer, "pursuant to a valid oral contract unrelated to the ERISA plan," for benefits that employer orally promised plaintiff before plaintiff accepted new position). Accordingly, ERISA preempts Plaintiff's state-law claims for recovery of in-vitro medical expenses.

### C. Breach Of Contract [6]

██ Plaintiff alleges Defendant breached its employment agreement with Plaintiff by: (1) failing to pay Plaintiff a $10,000 bonus, and (2) failing to provide coverage for Plaintiff's in-vitro medical expenses. The Court already has held Plaintiff's claim for in-vitro medical expenses is preempted by ERISA. *See* Section II.B, *supra.* It now turns to Plaintiff's alleged entitlement to a $10,000 bonus.

Plaintiff cannot recover for Defendant's alleged failure to provide him with future compensation, such as stock options or bonuses, because Plaintiff was an at-will employee. *See, e.g., E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. 357, 359 S.E.2d 148, 152 (1987). Plaintiff, however, here seeks to recover compensation he claims he earned before he was discharged. In *E.D.*

*Lacey Mills, Inc. v. Keith*, the court stated:

It is true an employee cannot sue to enforce future performance of a terminable-at-will employment agreement. However, an employee may sue on an oral contract for employment terminable at will for the amount of compensation due him, based upon services actually performed by him up to the time of his discharge, and not for damages or for compensation for services not performed or for any breach of contract.

183 Ga.App. 357, 359 S.E.2d 148 (1987); *see also Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir.1988) ("[A]n at-will employee may sue for any compensation that is due him under an oral contract, based on services actually performed by him up to the time of discharge."). In this case, Plaintiff has presented evidence he earned, but was not paid, a commission he earned prior to termination of his employment. Defendant asserts the terms of his bonus compensation were not determined prior to starting employment, were too indefinite to permit recovery, and were unenforceable promises of future compensation. (Def.'s Mot. for Summ. J. at 29.) Defendant's focus on Plaintiff's at-will status and the promise of future compensation misses the mark. Plaintiff claims the $10,000 bonus on the grounds it is for compensation that he had earned under a contract he had with the Company. Defendant does not point to any evidence that Plaintiff did not earn this bonus before he was terminated. "Georgia law provides that an at-will employee such as [Plaintiff] can recover damages which have accrued under [a] contract." *Livernois v. Medical Disposables*, 837 F.2d 1018, 1023 (11th Cir.1988). "Be-

---

**6.** The parties agree that Georgia law governs Plaintiffs' tort and contract claims. (*See* Def.'s Opp. to Pl.'s Mot. for Summ. J. at 5;

Pl.'s Opp. to Def.'s Mot. for Summ. J. at 15 n. 2.)

cause the Company did not discuss this issue in the pleadings or in its motion for summary judgment, it did not satisfy its burden of 'informing the district court of the basis of its motion.' Accordingly, there remains a genuine issue of material fact on the question whether [Plaintiff] was owed money under the oral contract at the time of termination." *Id.* Summary judgment on Plaintiff's breach of contract claim for the bonus is not appropriate.

### D. Breach Of The Implied Covenant Of Good Faith And Fair Dealing

Plaintiff claims Georgia law recognizes a claim for breach of a duty of good faith and fair dealing. (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 23.) In his Complaint, Plaintiff states, "IMV breached its covenant of good faith and fair dealing in dealing with Tart based on its misrepresentations regarding the status of the business and based on the benefits which it represented to Tart would be available to him." (Am.Compl.¶ 19.)

■ Plaintiff's claim for breach of the implied covenant of good faith and fair dealing in relation to his promised in vitro benefits is preempted by ERISA. *See* Section II.B, *supra.* To the extent Plaintiff's implied covenant claim is based on other conduct, Georgia law forecloses it. As the Eleventh Circuit explained in *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414 (11th Cir.1990), general allegations concerning the breach of an implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable. The *Alan's of Atlanta* Court explained:

[Plaintiff] did not allege ... that any explicit term in its contracts with [defendant] was ever breached. Thus, [plaintiff] sought to set the implied covenant up as an independent term in its contracts, subject to breach apart from any other. The district court rejected this attempt, and rightly so, for the "cove-nant" is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.* But it is not an undertaking that can be breached apart from those terms.

*Id.* at 1429 (affirming summary judgment on plaintiff's claim for breach of implied covenant of good faith and fair dealing). Plaintiff's claim fails because the alleged breach of the implied covenant of good faith and fair dealing is not raised in connection with a breach of an express term of the parties' agreement. Accordingly, Defendant is entitled to summary judgment on this claim.

### E. Fraud

■ Under Georgia law, to prove fraud a plaintiff must show: (1) a false representation by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *See Cramp v. Georgia–Pacific Corp.,* 266 Ga.App. 38, 596 S.E.2d 212, 214 (2004); *see also* O.C.G.A. § 51–6–2(a) ("Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action."). To be actionable, a fraud claim must relate to an existing fact or a past event. *Fuller v. Perry,* 223 Ga.App. 129, 476 S.E.2d 793, 796 (1996).

Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events. Representations concerning expectations and hopes are not actionable.... It is elementary that no one has a right to rely on a statement of another as to what could and would take place in the future. The activities of life are too uncertain for anyone to depend on such representations. And the law recog-

nizes no actionable right in the event one does rely upon such uncertainties. *Id.* (citations and quotations omitted). General statements about a company's future, expressions of opinion, or mere "puffing," cannot serve as the basis for a fraud action. *See Livernois*, 837 F.2d at 1024.

Although fraud generally cannot be based on statements regarding future events, "there is an exception to this proposition, which is that fraud may be predicated on a promise made with a present intention not to perform." *Kirkland v. Pioneer Machinery, Inc.*, 243 Ga.App. 694, 534 S.E.2d 435, 436 (2000). However, Georgia courts consistently have refused to apply this exception in the at-will employment context. Promises regarding future events are "unenforceable even absent any fraud at the time of their utterance ... because the underlying employment contract, being terminable at will, is unenforceable." *Alston v. Brown Transp., Corp.*, 182 Ga.App. 632, 356 S.E.2d 517, 519 (1987); *see also Kirkland*, 534 S.E.2d at 436–37; *Cramp*, 596 S.E.2d at 214.

In this case, Plaintiff claims Defendant made various false representations to induce Plaintiff to enter an employment agreement with the Company. The Court will analyze each of Plaintiff's claims of fraud under the standards discussed above.[7]

### 1. Existing Products In United States Market

■ Plaintiff claims the Company represented in a September 22, 1999 press release that it would be selling products from 5 KVA to 500 KVA, and that all of the Company's products are UL-listed. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 17.) Plaintiff alleges this statement was untrue claiming Defendant did not make UL-listed products over 40 KVA available in America until four months after Plaintiff began working at the Company, and never had UL-listed products larger than 120 KVA. (*Id.*) Plaintiff also claims the Company falsely represented that the Company's products were "FCC compliant."

Plaintiff has presented sufficient evidence on his claim of false representations regarding the available product line to survive summary judgment. Plaintiff asserts Defendant made significant and specific misrepresentations about its product line, its scope, characteristics and availability for sale. Plaintiff alleges false representations of existing facts. *See Plane v. Uniforce MIS Servs. of Georgia, Inc.*, 223 Ga.App. 731, 479 S.E.2d 18 (1996) (misrepresentation to prospective employee regarding the employer's execution of a written agreement could provide basis for fraud claims).[8] Plaintiff has presented evidence that he was given marketing materials as

---

**7.** Defendant claims Plaintiff, as a matter of law, waived any possible claim of fraud because he continued to work after discovering the fraud alleged. (Def.'s Mot. for Summ. J. at 24.) Defendant relies on *Little Sky, Inc. v. Rybka*, 264 Ga.App. 744, 592 S.E.2d 154, 157 (2003), in support of its waiver argument. In *Little Sky*, the court found that defendants who continued to perform under a contract for over five years waived their *defense* of fraud to a breach of contract action asserted against them. *Little Sky* is far from the case here. In this matter, plaintiff asserts he was defrauded into an employment relationship. Defendant has not presented evidence regarding when Plaintiff discovered he had been

misled, when he was able to assert any damage the misrepresentations allegedly caused, and how long he remained with the company after these matters were discovered. The record facts are that Plaintiff worked for the Defendant for only a year before he announced his departure. Neither the facts here nor *Little Sky* allow the Court to find as a matter of law that Plaintiff's claims of fraud are barred.

**8.** Because the representations at issue were not about future benefits or other future promises, *Cramp, supra,* and *Ely v. Stratoflex, Inc.*, 132 Ga.App. 569, 208 S.E.2d 583 (1974), do not apply.

**1184**

part of the Company's effort to recruit him. These materials stated "All IMV UPS systems are UL-listed." (Sept. 22, 1999 Press Release, attached as Exh. 6 to Pl.'s Mot. for Summ. J.) Defendant claims this was only "corporate puffing" and actually meant the Company would be selling only UL-listed units in the future. (Def.'s Mot. for Summ. J. at 12.) Defendant's argument is unconvincing. When Defendant recruited Plaintiff it represented all its systems were UL-listed, when they were not. Plaintiff testified UL-listing was important to him when he made his decision to join the Company, and that he exercised diligence by researching and visiting the Company. Plaintiff alleges in accepting the position offered, the misrepresentation ultimately caused him damage. Viewing all facts in a light most favorable to Plaintiff, this evidence is sufficient to survive summary judgment. *See Plane,* 479 S.E.2d at 20–21 (finding genuine issue of material fact whether employer fraudulently induced plaintiff to leave his former job based on false representation of existing fact). There remains a genuine issue of material fact whether Defendant made false representations of existing fact regarding its available product line and thus fraudulently induced Plaintiff to join the Company.

■ The Company's representation that its Site Pro product line was FCC compliant are not actionable because the Company's representations were not false. Defendant only claimed the products were "FCC compliant." It is undisputed the FCC has different grades of compliance, and that the Company's Site Pro products complied with FCC requirements, even if they were not "Class A" compliant. Thus, the Company's representation was not

false[9] and summary judgment on this statement is appropriate.

### 2. North Carolina Facility

■ Plaintiff claims Defendant represented during his recruitment that Defendant had a North Carolina manufacturing facility. The facts are a functioning manufacturing facility in North Carolina did not exist. The Company only had a contract to manufacture in North Carolina, and had sent numerous representatives to North Carolina in furtherance of this objective.

Plaintiff's claim is based on the Company's May 22, 2000 press release, given to Plaintiff when he was recruited, which stated:

In addition to establishing a manufacturing facility in North Carolina, IMV recently announced that ... [PMI] would provide global maintenance services for IMV products. IMV Energy Systems of America President Jurg Schwerzmann noted, "The infrastructure is now in place to offer world-class products and services to our North American customers."

(May 22, 2000 Press Release, attached as Exh. 7 to Pl.'s Mot. for Summ. J.) Defendant contends this is "corporate puffing," and that when read in context the representation essentially is "prospective and forward looking." (Def.'s Mot. for Summ. J. at 15–16.) That is, Defendant argues the press release simply meant the Company was in the process of setting up the North Carolina facility.

The Court disagrees. Construing the facts in the light most favorable to Plaintiff, the May 22, 2000 press release states that the North Carolina facility had already been established. This misrepresentation regards an existing fact,[10] rather

---

**9.** Plaintiff states the Company did not discover there was an issue with FCC compliance until "just prior to [Plaintiff] leaving the company." (Tart Depo. Tr. at 103.) Under these

facts, Plaintiff also cannot demonstrate scienter.

**10.** The statement is at least ambiguous.

than a promise in the future, and is actionable under Georgia law. Plaintiff testifies that this was an important factor in his decision to join the Company, and it is undisputed Defendant knew the facility was not established at the time the representation was made. While Defendant claims Plaintiff should have inquired as to the status of the facility to satisfy his due diligence, (Def.'s Mot. for Summ. J. at 10), in light of the statements affirmatively made to the Plaintiff and the Defendant's efforts to research the Company, the Court will not impose such an obligation in hindsight. Rather, Plaintiff's due diligence is an issue of fact for the jury. Because there remains a genuine issue of material fact whether Plaintiff was fraudulently induced to join the Company through misrepresentations of existing fact regarding the North Carolina manufacturing facility, summary judgment on this claim is denied. *See Plane,* 479 S.E.2d at 20–21.

### 3. *Commitment Of Capital*

■ Plaintiff claims Defendant promised it would commit $7.5 million for the Company's operations in the United States, but that commitment never materialized. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 18.) Plaintiff claims the commitment was made by the Company's CEO on May 7, 2000.

Plaintiff cannot sustain a claim for fraudulent inducement on the basis of misrepresentations regarding the Company's future financial commitments to U.S. operations. First, Plaintiff admits the representation was made on May 7, 2000, nearly two weeks *after* Plaintiff signed his employment agreement with the Company. This alleged misrepresentation could not have induced Plaintiff to join the Company. Second, Plaintiff has not presented evidence money was not spent on U.S. operations. (*See* Def.'s Mot. for Summ. J. at 18). His assertion it was not constitutes speculation and conjecture insufficient to

survive summary judgment. Third, any alleged promise to spend money on future development is not actionable under Georgia law. *See Livernois,* 837 F.2d at 1023 (finding no fraud cause of action when defendant "stated in his deposition that he merely told [plaintiff] that he believed that the Company would receive new money and would have possibilities for growth"); *Ely v. Stratoflex, Inc.,* 132 Ga.App. 569, 208 S.E.2d 583, 584 (1974) ("Actionable fraud cannot be based on statements and promises as to future events."). Summary judgment on this statement is in order.

### 4. *IBM Business Relationship*

■ Plaintiff claims the Company represented it was a top supplier of IBM, when the Company never sold anything to IBM in the United States. (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 18.) In a February 14, 2000 press release, the Company stated "IMV Energy Systems of America (IMV) was recently ranked as one of IBM's top suppliers." (Feb. 14, 2000 Press Release, attached as Exh. 10 to Pl.'s Mot. for Summ. J.) The facts are that the award was given to IMV's European, Middle Eastern and Asian divisions, not the American. Defendant contends the marketing document was created by its public relations firm, was "corporate puffing," and that IBM had permitted the Company to use the award for its foreign operations, to help its U.S. entry.

The undisputed fact is that IMV Energy System of America, Inc., had not sold any products to IBM when it represented it was one of IBM's top suppliers. It is irrelevant that a public relations firm created the press release and that IBM permitted the award to be used to promote the Company's U.S. operations. The relevant inquiry is whether the representation was false and given to Plaintiff to induce him to join the Company. It is undisputed Plaintiff was given this press release as

part of the Company's efforts to recruit him, knowing the Company was not a top United States supplier to IBM. Plaintiff testified that this relationship with IBM was important to him in deciding to join the Company. The Court finds there are genuine issues of material fact whether the Company fraudulently induced Plaintiff to join the Company based on false representations of existing fact regarding the Company's relationship with IBM. *See Plane*, 479 S.E.2d at 20–21.

### 5. Business Partners

Plaintiff claims Defendant misrepresented its relationship with several business partners. (Pl.'s Mot. for Summ. J. at 5). Plaintiff does not make any arguments in support of this claim. (*See* Pl.'s Mot. for Summ. J.; Pl.'s Opp. to Def.'s Mot. for Summ. J.) Even if Plaintiff has not abandoned this claim, the Court has reviewed the record and finds Defendant did not make any actionable misrepresentations regarding its relationship with unnamed business partners. Plaintiff's allegations are based on vague statements that were not false and he could not justifiably have relied on them. Accordingly, Plaintiff's claim for fraud in regards to Defendant's alleged misrepresentation of its relationship with business partners fails.[11]

### F. Negligent Misrepresentation

Under Georgia law, a plaintiff must prove three elements to establish a claim for negligent misrepresentation: (1) the defendant's negligent supply of false information to plaintiff; (2) plaintiff's reasonable reliance upon that false information; and (3) economic injury resulting from such reliance. *Next Century Comms. Corp. v. Ellis*, 318 F.3d 1023, 1030 (11th

Cir.2003). "[T]he reasonable reliance that is required to state a negligent misrepresentation claim is equivalent to that needed in the fraud context." *Id.* Plaintiff's claims for negligent misrepresentation succeed and fail for the same reasons as Plaintiff's fraud claims succeed or fail as stated in Section II.E, *supra.*

### G. Defendant's Counterclaims

 Plaintiff moves for summary judgment on Defendant's counterclaims for Plaintiff's alleged misappropriation of Defendant's property. Plaintiff argues Defendant's claim "is absolutely baseless since Tart offered in writing while still employed by IMV to return all equipment if IMV would pay for the shipping." (Pl.'s Mot. for Summ. J. at 17.) Defendant, on the other hand, presents evidence that Plaintiff removed computer equipment and other Company property from the office after he received his six-month notice of discharge, and refused to return it, in part, because he believed the Company owed him money. (*See* Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. at 24.) The Court finds there are genuine issues of material fact regarding Defendant's counterclaims under various state-law theories for Plaintiff's alleged misappropriation of trade secrets and Company property.

## III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.** Defendant's Motion for Summary Judgment is GRANTED on Plaintiff's

---

11. In allowing Plaintiff's fraud claims to proceed on these specific representations discussed above, the Court does not express any opinion on the strength of the claims. It simply states these are jury issues to be decided because material facts are in dispute, even if the dispute is slight.

breach of the implied covenant of good faith and fair dealing claim. Defendant's Motion for Summary is **GRANTED** on Plaintiff's breach of contract claim for health benefits, and is **DENIED** on Plaintiff's breach of contract claim for an unpaid $10,000 bonus. Defendant's Motion for Summary Judgment is **GRANTED** on Plaintiff's fraud and negligent misrepresentation claims for alleged misrepresentations regarding FCC compliance, capital investment and business partners. Defendant's Motion for Summary Judgment is **DENIED** on Plaintiff's fraud and negligent misrepresentation claims for alleged misrepresentations regarding UL-listed products, the North Carolina manufacturing facility, and relationship with IBM.