**Mariano CIBRAN, Plaintiff,**

v.

**BP PRODUCTS NORTH AMERICA, INC. f/k/a Amoco Oil Company, Defendant.**

**Nos. 03–60069–CV, 03–60069–CIV.**

United States District Court, S.D. Florida, Miami Division.

June 14, 2005.

Moises Melendez and Mark Blumstein Gordon, Hargrove & James, P.A., Ft. Lauderdale, FL, for BP.

Bernard L. Egozi of Isicoff Ragatz & Koenigsberg, P.A., Miami, FL, for Mariano Cibran.

### ORDER GRANTING BP'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 52

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Defendant, BP Products North America, Inc.'s ("BP['s]")[1] Motion for Judgment as a Matter of Law Under Rule 52, following the close of evidence on Plaintiff, Mariano Cibran's case. Under Federal Rule of Civil Procedure 52(c), "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue .... Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule."

Mr. Cibran has been fully heard on his one remaining claim, found in paragraph 14 of his Verified Second Amended Complaint, that BP breached its obligation of good faith and fair dealing because "[c]ommencing in mid–2001 ... Amoco began to set the retail price of gasoline to be sold at the [Jacaranda Amoco] at a rate, on average, of approximately five cents per gallon higher" than competitors in the same area. Based upon the evidence presented by Mr.

---

1. BP is the successor in interest to Amoco Oil Company. Accordingly, "BP" and "Amoco" are used interchangeably throughout this Order to refer to the Defendant.

Cibran, controlling law compels a finding that his claim cannot be maintained.

## Findings of Fact

The "Factual Background" contained in the Court's Order on Pending Motions of February 24, 2005 [D.E. 133] is incorporated fully, as the evidence presented at trial supports the Court's earlier factual observations. More particularly, on October 28, 1998, BP entered into two four-year agreements (the "CM Agreements") with Jay Weinstock regarding the operation of the Jacaranda Amoco service station: a Commission Marketer Agreement ("CMA") and a Lease Agreement ("CML"). Mr. Weinstock paid monthly rent to lease premises that were used as a food shop and carwash adjacent to a parcel of land to be used as a motor fuel sales facility (the "Fuel Facility"). Mr. Weinstock operated the Fuel Facility according to the terms of the CMA although the CML excluded the Fuel Facility from the premises that Mr. Weinstock leased.

Under the CMA, Mr. Weinstock acted as an independent contractor "to dispense motor fuels at the Fuel Facility in the name and on behalf of Amoco and furnish services related thereto." Under the CMA, BP would supply the fuel and equipment necessary to dispense the fuel at the Fuel Facility, and "[a]ll inventories of motor fuels shall be owned by Amoco and shall be dispensed by Marketer on behalf of Amoco at retail prices established by Amoco." Therefore, Mr. Weinstock was required to periodically perform "motor fuel street price surveys, record and transmit the survey information and make sign and system price changes in the manner and at the times established by Amoco from time to time." Furthermore, Mr. Weinstock's sole compensation under the CMA was a commission fee of 7.5 cents per gallon of motor fuel sold at the Fuel Facility.

The CMA and CML also contain other applicable provisions. The CML states that "[i]f Tenant presents Amoco with NSF [not sufficient funds] checks on two (2) or more occasions within any twelve (12) month period during the term of this Agreement, Amoco may terminate this Agreement." The CMA and CML also provide that "giving one or more insufficient funds checks" is grounds for BP to terminate or not renew the agreements "upon 90 days written notice or such shorter notice as is reasonable . . . ."

In the fall of 2000, Mr. Weinstock sold to Mr. Cibran "all of [Mr. Weinstock's] assets or properties pertaining to the business known as Jacaranda Amoco" in exchange for $550,000, and Mr. Cibran agreed to be bound individually by the CM Agreements. Mr. Cibran performed due diligence on the books and records of the gas station, following communications with Mr. Weinstock and Joel Bowie, the sales representative handling the transaction. Mr. Cibran, a young entrepreneur with a business degree and experience in owning and operating a "Chicken Kitchen" franchise, obtained a loan from his father, and without prior experience in operating service stations, commenced day-to-day operations of the Jacaranda station on November 29, 2000. Based on his due diligence, he anticipated to match Mr. Weinstock's annual net income of $244,200.

Mr. Cibran brought over his Chicken Kitchen manager to run the daily operations at the station but kept most of Mr. Weinstock's employees. He invested sums of money in improving the landscaping, making inventory improvements at the convenience store, and kept in place the

maintenance contract associated with the car wash. In the beginning, everything was fine. Because he had greater expenses than Mr. Weinstock, however, Mr. Cibran did not experience the cash flow that he had observed in Mr. Weinstock's records. Nevertheless, his cash flow from operations in January 2001 was $7,925; in February 2001 his cash flow was $9,072; in March 2001 his cash flow was $8,637; and in April 2001, his cash flow was $4,476.

Starting in late April, early May 2001, however, Mr. Cibran maintains that BP began to set the price of gasoline at the station far in excess of the rest of the competition. Mr. Cibran maintains that BP was consistently setting the price of gasoline at the Jacaranda Station five to six cents per gallon above the most expensive competitor in the local area. As a result of BP's setting prices so far in excess of his competitors, he began to lose business. Furthermore, because BP did nothing to ameliorate the situation by, for example, drastically reducing prices in June and July (instead, Mr. Cibran claims that BP actually increased prices again in August 2001), he was unable to win back those customers whom he had lost.[2]

The evidence presented does not bear out Mr. Cibran's claims. Admittedly, Mr. Cibran made his assertion that BP was setting prices at five to six cents above the most expensive competitor in the area without the benefit of BP's financial records. The evidence shows the following, as to the relevant time period and closest competitors when Mr. Cibran maintains BP violated its obligation of good faith and fair dealing in the setting of gas prices for unleaded regular:

4/30/01: Shell (157.9) as compared to Amoco (156.9), a difference of–1, Chevron (156.9) as compared to Amoco (156.9), a difference of 0.

5/1/2001: Shell (172.9) as compared to Amoco (169.9), a difference of –3. Chevron (169.9) as compared to Amoco (169.9), a difference of 0.

5/2/2001: Shell (169.9) as compared to Amoco (162.9), a difference of –7. Chevron (162.9) as compared to Amoco (162.9), a difference of 0.

5/3/2001: Shell (168.9) as compared to Amoco (172.9), a difference of 4. Chevron (172.9) as compared to Amoco (172.9), a difference of 0.

5/4/2001: Shell (169.9) as compared to Amoco (172.9), a difference of 3. Chevron (172.9) as compared to Amoco (172.9), a difference of 0.

5/7/2001: Shell (169.9) as compared to Amoco (172.9), a difference of 3. Chevron (172.9) as compared to Amoco (172.9), a difference of 0.

5/8/2001: Shell (169.9) as compared to Amoco (172.9), a difference of 3. Chevron (172.9) as compared to Amoco (172.9), a difference of 0.

The Shell station at 7901 West Broward Boulevard, approximately two miles from the Jacaranda Amoco, was the first to raise its price for unleaded regular from 156.9 on April 30 to a high of 172.9 on May 1, 2001. The data for the entire month, containing comparable prices for all grades of fuel for the six closest competitors is contained in Trial Exhibit 29 (Sealed) and is incorporated by reference. Suffice it to say, the figures in the exhibit do not bear

2. Curiously, Mr. Cibran did not wait to see if the situation would improve, as he put his interest in the Jacaranda Station up for sale in May of 2001 by contacting his broker, Mr. Bowie.

out Mr. Cibran's claim. Indeed, from April 2001 through the remainder of Mr. Cibran's occupancy of the BP Station, the most common price BP charged was within a penny or so of the relevant competition, including the Chevron, Shell, and Mobil stations on Broward Boulevard. BP's average price for fuel during this period was less than one penny different from that of Chevron and Shell on Broward Boulevard and approximately only one penny different from the prices charged at the Mobil and other competitive stations. These averages were attained during a time when fuel prices for unleaded regular at the Jacaranda station dropped from 172.9 in early May 2001 to 114.9 in December 2001, after starting the year at 149.9.

Mr. Cibran admits that under his contract with BP, BP could have charged its customers prices ranging from ten cents under to up to ten cents higher than the competition. Mr. Cibran admits that BP set the prices for its fuel following the receipt from him of the motor fuel street price surveys. Although Mr. Cibran does not complain of the prices charged in the months of June and July, his complaint is that BP should somehow have set fuel prices far lower than competition to enable him to attract customers lost during the month of May 2001. He also complains that the prices set for fuel in the month of August rendered him uncompetitive. These last two claims, however, do not form the basis of his claim of BP's breach of its duty of good faith and fair dealing but rather have been presented during trial to support the claimed breach.

The evidence did show that Mr. Cibran was not an active and involved owner and that he employed a manager lacking in experience in the running of a gas station. Mr. Cibran failed to timely pay BP for the sale of fuel on at least twelve occasions, resulting in notices of insufficient funds. Mr. Cibran on at least two occasions failed to submit timely and accurate street price surveys as required. Mr. Cibran failed at least two "mystery shop" audits performed at his station, designed to ensure that he was maintaining required standards and appearance. Accordingly, by letter dated September 26, 2001, BP informed Mr. Cibran that it was terminating the CM Agreements effective January 24, 2002, due to a third "incident in which a draft for the gross receipts from the sale of motor fuels was returned to Amoco due to insufficient funds."

### Conclusions of Law

■ "Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1315 (11th Cir.1999) (citations omitted). " 'It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.*' " *Id.* (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1429 (11th Cir.1990)).

■ The "duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Hospital Corp. of America v. Florida Med. Ctr.,* 710 So.2d 573, 575 (Fla. 4th DCA 1998). "Rather than serving as an independent term within a contract, the implied covenant 'attaches . . . to the performance of a specific contractual obligation.' " *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260

F.3d 1285, 1291 (11th Cir.2001) (quoting *Johnson Enters., of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1314 (11th Cir.1998)). The Eleventh Circuit has therefore held that "no independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing. Where a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie." *Weaver,* 169 F.3d at 1317–18.

"With the implied covenant, one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Ernie Haire Ford,* 260 F.3d at 1291 (citing *Sepe v. City of Safety Harbor,* 761 So.2d 1182, 1185 (Fla. 2d DCA 2000); *Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1097–98 (Fla. 1st DCA 1999)). Nevertheless, "the limit placed on a party's discretion is not great. As the Florida Second District Court of Appeal has stated, 'Unless no reasonable party … would have made the same discretionary decision …, it seems unlikely that [the party's] decision would violate the covenant of good faith ….'" *Id.* (alteration in original) (quoting *Sepe,* 761 So.2d at 1185).

■ In this case, Mr. Cibran has not shown that BP capriciously exercised its discretion under the CMA in setting the retail price at the Jacaranda station and has not shown that "no reasonable party" would have made the same discretionary decisions. Specifically, the Shell station on Broward Boulevard was the first competitor to raise its prices in May 2001. BP and Chevron followed suit shortly thereafter. Mr. Cibran has come forward with no evidence that Shell or Chevron acted unreasonably in their decisions to raise gaso-line prices, and the evidence merely shows that BP followed Shell's lead and priced its product similarly to its nearby competitors. Furthermore, actual pricing data disproves Mr. Cibran's allegation that BP set the price at the Jacaranda station on average five to six cents per gallon higher than the competition. Rather, from April 2001 through the remainder of Mr. Cibran's occupancy, the most common price BP charged for regular gasoline was within a penny or so of the relevant competition.

Because both Shell and Chevron made similar discretionary pricing decisions from May 2001 forward, Mr. Cibran has not shown that "no reasonable party" would have made the same discretionary decisions that BP made. Furthermore, because the evidence indicates that BP made its pricing decision in response to a competitor's price changes, Mr. Cibran has failed to show that BP acted capriciously. Moreover, BP's decision not to make price adjustments at the Jacaranda station in response to lower fuel sales there does not translate into capriciousness. BP's prices were not tied to volume of fuel sold, nor was there a contractual obligation for BP to set its prices lower than the nearby competition to react to the volume of fuel sold at the Jacaranda station. Accordingly, Mr. Cibran's claim for breach of the implied covenant of good faith and fair dealing must fail. Finally, BP's decision to terminate the CM Agreements did not constitute a breach on the part of BP of any of its obligations, as this action was justified by Mr. Cibran's twelve instances of insufficient funds which, according to the CM Agreements, were grounds for termination.

For all of the reasons stated above, it is **ORDERED AND ADJUDGED** that BP's

Motion for Judgment as a Matter of Law Under Rule 52 is **GRANTED**. Judgment shall be entered in favor of BP and against Mr. Cibran, and Mr. Cibran shall take noting in the action.